THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES E. CLENDENIN, Defendant-Appellant.

Second District   No. 2—07—0359

Opinion filed August 18, 2009.

Stephen A. Brundage, of Wheaton, for appellant.

John A. Barsanti, State's Attorney, of St. Charles (Stephen E. Norris and Rebecca E. McCormick, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE O'MALLEY delivered the opinion of the court:

Following a stipulated bench trial, defendant, Charles E. Clendenin, was convicted of unlawful possession of child pornography (720 ILCS 5/11—20.1(a)(6) (West 2002)). He appeals, arguing that the trial court erroneously denied his motion to quash arrest and suppress evidence, that his trial counsel provided him with ineffective assistance, and that the evidence was insufficient to support his conviction. For the reasons explained below, we reverse and remand.

## I. BACKGROUND

On September 5, 2003, defendant was charged with unlawful possession of child pornography. The information alleged that defendant possessed a video clip of a female child under the age of 18 years engaged in an act of sexual penetration. On September 19, 2003, defendant's counsel, Larry Wechter, filed a motion for discovery, seeking relevant materials concerning defendant's prosecution.

### A. Evidence Pertaining to the Motion to Quash and Suppress

In October 2003, defendant filed a motion to quash arrest and suppress evidence. Defendant sought suppression of items that Ellen Bailey took from his home on August 29, 2003, and later gave to police, as well as all items obtained during a subsequent search of his home by police. Defendant also sought to quash his arrest, which transpired after the police examined the items Bailey had given them. On January 23, 2004, the trial court held a hearing on the motion to quash and suppress.

Ellen Bailey was the first witness. She testified that she was defendant's neighbor in St. Charles, Illinois. She and defendant had become romantically involved in the three months Bailey had known defendant. The two had exchanged keys to their residences and visited each other from time to time. Defendant traveled occasionally and had asked Bailey to check on his residence and clean it when he was absent. Defendant also allowed Bailey to use his washing machine.

Bailey testified that, on August 29, 2003, defendant was on vacation in Russia, and Bailey entered defendant's residence to retrieve a vacuum cleaner she had left there. While in defendant's residence, Bailey noticed what she believed might be four pinhole cameras next to defendant's computer. Bailey testified that, because she had young children, she became concerned upon seeing easily hidden cameras. Bailey decided to look around to see if she could find any recordings defendant might have made. Bailey discovered a zipper case contain-

ing compact discs (CDs) on a shelf behind defendant's computer. Bailey opened the case and observed around 50 CDs, only some of which were labeled. Bailey testified that the discs that were labeled had handwritten dates on them; she could not recall any other information being written on the case or the discs. Bailey took the cameras and the discs back to her residence.

Bailey testified that she placed several of the discs into her own computer. Bailey testified that she looked at the content of only one of the discs, however. The files on that disc had "very disturbing" titles such as " 'mother f---s 8-year-old' " and "something about toddler daycare." Bailey viewed one of the files, which depicted what appeared to be a "grown man having sex with a 13-year-old." Bailey kept the disc, believing it to contain child pornography. Bailey returned the remainder of the CDs and the case to defendant's residence, but kept the pinhole cameras.

Bailey testified that, on September 1, 2003, she called West Chicago police officer Bruce Malkin, a friend she had known for a long time. Bailey met with Malkin at the West Chicago police department and gave him the cameras and the CD she had taken from defendant's residence. Bailey testified that she told Malkin the circumstances of her discovery of the disc, including that defendant was out of the country and had not given her permission to investigate or take any of his belongings. Bailey testified that she told Malkin that she had permission only to clean defendant's residence and water his plants. Bailey then told Malkin "what she saw on the disc" she had viewed.

Bailey testified that, on the following day, she met with police officer Andrew Lamela at the St. Charles police department. Bailey gave Lamela the same information that she had provided to Malkin about the circumstances under which she discovered the disc and its contents.

Malkin testified next. His testimony corroborated and mirrored Bailey's about the circumstances under which Bailey had taken the CD. Malkin testified that Bailey told him that she had previously viewed the contents of the disc at her residence. Bailey told Malkin that the disc contained "what she suspected to be child pornography." Malkin testified that Bailey was very upset and had difficulty describing the contents of the disc. Malkin accepted the disc from Bailey and noticed that the external label on the disc contained only a date, " '20 November 2.' " Malkin used his own computer to view the contents of the disc but did not seek a search warrant before doing so. Malkin found several images and video files on the disc. He viewed one of the video clips and believed it depicted child pornography. Malkin then placed the disc and the pinhole cameras into evidence at the West

Chicago police department until he turned them over to the St. Charles police department.

Lamela was the final witness at the hearing. Lamela testified that, on September 2, 2003, he spoke with Bailey, receiving the same background information that Bailey had recounted to Malkin. Lamela testified that, after speaking with Bailey, he wanted to investigate the CDs in defendant's residence as well as to look at the disc Bailey gave to Malkin. Lamela testified that he did not seek a search warrant at this time.

Lamela testified that, on September 3, 2003, he met with Malkin and received the CD and cameras that Bailey had provided. Malkin told Lamela that these were the items that Bailey had taken from defendant's residence. Malkin also informed Lamela that Bailey admitted that she did not have defendant's permission to take anything from his residence. Lamela testified that there was nothing on the outside of the items to indicate that they contained child pornography. Lamela viewed the disc for himself without first seeking a search warrant. He determined that the disc contained child pornography.

Lamela testified that, later on September 3, 2003, he arrested defendant at his place of employment. At the police station, Lamela advised defendant of his *Miranda* rights. Defendant agreed to give a statement. Defendant first gave a nonrecorded oral statement, which Lamela summarized in a police report. Defendant later gave a second statement, which Lamela recorded on audiotape. After he took the statements, Lamela asked defendant for permission to search his home, and defendant gave his consent. While searching defendant's home with fellow officers, Lamela seized a case containing several CDs.

On February 25, 2004, the trial court issued its decision denying defendant's motion to quash and suppress. The trial court found that Bailey was not acting as an agent of the State when she removed the disc and cameras from defendant's home, and hence there was no state action involved in the police's acquisition of those items. The court further found that, when the police examined the items Bailey gave them, they had probable cause to arrest defendant. Defendant filed a motion to reconsider, which the trial court denied.

### B. Stipulated Bench Trial

On September 23, 2004, the parties appeared before the trial court for a bench trial based on stipulated evidence. This exchange took place:

"MR. WECHTER: We are here this morning because we want to waive the right to a jury and present a stipulation to you and have

you decide the defendant's guilt on the basis of our stipulated evidence.

\*\*\*

THE COURT: All right. Mr. Clendenin, you have, I am sure, spoken with Mr. Wechter?

MR. CLENDENIN: Yes.

THE COURT: In reference to the fact that if you give up your right to a jury trial it is a permanent waiver and that you are the only one that can do it? Most things legally that are done can be undone. A jury waiver cannot. Do you understand if you have a jury trial 12 people have to be unanimous about a verdict? The burden of proof is always beyond a reasonable doubt. That would apply to a jury trial or a trial before a judge called a bench trial. Do you understand that?

MR. CLENDENIN: Yes, I do.

THE COURT: You are a high school graduate, sir?

MR. CLENDENIN: College graduate.

THE COURT: And, Mr. Clendenin, has anyone threatened you to make you waive the jury?

MR. CLENDENIN: No.

THE COURT: Anyone promise you anything other than you won't have a jury trial? You will have a trial before a judge.

MR. CLENDENIN: No.

THE COURT: Do you have any questions of me?

MR. CLENDENIN: No, I don't.

THE COURT: Has he executed [the stipulation], Mr. Wechter?

MR. WECHTER: I am going to have him do that right now. I have signed it as a witness, Judge.

THE COURT: All right. Thank you very much. And with that, you wish to proceed instanter?

MR. WECHTER: Yes. We have a written stipulation for you that both counsel have signed, and there are the two exhibits that are referred to in the stipulation.

\* \* \*

THE COURT: Did you have a preliminary hearing, or did I get ahead of myself?

MR. WECHTER: If I recall, we waived some time ago, but I could be mistaken.

THE COURT: Let me see if I can readily find it.

MR. WECHTER: If not, we would have no problem doing that today, obviously.

THE COURT: I think that it is possible that we went right into the motion to suppress, although I would be glad to have you look at this and you might readily find it faster than I did.

MR. WECHTER: If you would like.

I don't see one either, Judge. We are certainly prepared to do that today.

THE COURT: All right. So, Mr. Clendenin, you are entitled to either [*sic*] have a preliminary hearing where you would have a right to cross-examine any witness that the State will call. The State can use hearsay evidence, and so they can use one witness to testify about their knowledge about the case, for instance[,] but you would have a right to cross-examine any witnesses called. Sometimes the State proceeds to an indictment where you would not be present and have the right to cross-examine usually and— well, usually that would apply. At this time, it's my understanding that you are waiving the preliminary hearing, which means that that procedure would not occur and we would go into the issue that is presented by way of stipulation?

MR. CLENDENIN: Yes.

THE COURT: That's what you wish to do?

MR. CLENDENIN: Yes.

THE COURT: Are you doing that voluntarily?

MR. CLENDENIN: Yes, I am.

MR. WECHTER: I might add, Judge, that you certainly heard quite a bit of testimony to the motion to suppress that would suffice for probable cause.

THE COURT: I did. Although, that wasn't the purpose of it.

MR. WECHTER: Right.

THE COURT: Yes, that's true. I find that he has sufficiently waived."

The stipulation was not recited on the record nor was its specific content described in any way.[1] The court took the stipulation under advisement.

On January 13, 2005, the trial court announced that it could not accept the stipulation because it did not identify the source of the evidence upon which it was based:

"This comes on for status on the stipulation and evidence which I received on September 23rd. On that date I received a two-page stipulation which was given to me along with People's Exhibit[s] 1 and 2. People's Exhibits 1 and 2 are described in the stipulation as photographs of the video clip referred to in the complaint for preliminary hearing. In the complaint for the preliminary hearing it refers to 'video clip with a file name of R@YGOLDREELKIDDYMO.MPG.' People's Exhibit[s] 1 and 2 do not have any file name on them. People's Exhibits 1 and 2 appear

---

[1]The record on appeal does not contain the September 2004 stipulation.

to portray a female child whom the defendant knew, or reasonably should have known, was under the age of 18 years which showed the female child actually or by simulation engaged in the act of sexual penetration.

I have some questions which are not readily apparent from the stipulation and from the evidence. They are: What is a video clip? Where did the video clip come from? Did it come from a disk? Did it come from the disk that Ellen Bailey delivered to the West Chicago Police Department?"

The court set the matter for status on February 17, apparently to allow the parties to refashion the stipulation if they desired. On February 17, Wechter informed the court that an item of discovery had just become available from the State the previous day and that the parties needed additional time to rework the stipulation. The court continued the matter.

On March 16, 2005, Wechter announced to the court that the parties had agreed on a "new stipulation." This stipulation was not read into the record nor was its content related in any way on the record. The record on appeal contains the stipulation, and this is the entirety of it:

### "STIPULATION

NOW COME the parties to this cause and hereby stipulate to the availability of the following evidence for purposes of proceeding with a bench trial of the charge of unlawful possession of child pornography alleged in the Complaint for Preliminary Hearing.

The parties agree that the witnesses called at the hearing on the defense Motion to Quash Arrest and Suppress Evidence held on January 23, 2004[,] would provide the same testimony that was presented on that date, including the introduction of the same exhibits. The State moves for admission of photographs of the video clip referred to in the Complaint for Preliminary Hearing, marked People's Exhibits # 1 & 2. The photographs portray a portion of one of the video clips contained on the computer disk taken from [defendant's] apartment by Ellen Bailey on August 29, 2003[,] and delivered to the West Chicago Police by Ellen Bailey on September 1, 2003. [Defendant] objects to the introduction into evidence of People's Exhibits # 1 & 2 on the same grounds presented at the hearing on the defense Motion to Quash Arrest and Suppress Evidence and the subsequent Motion to Reconsider. [Defendant] requests the Court to reconsider and reverse its previous rulings concerning the admissibility of this evidence.

If called as a witness, [Lamela] would testify that he interviewed [defendant] on September 3, 2003[,] following his arrest in this case. After waiving his Miranda rights, [defendant] stated that he

logs on to the internet to a website from which he downloads music and pornography. He typed in key words for the pornography in the search engine and then downloads all the files to his hard drive. Later, he transfers the files to a disk and then views them. He does not know what he downloads until the file has been viewed. He admitted to possessing six disks containing pornography in his apartment. When asked if he knew how many video clips of child pornography were contained on the disks, he stated, 'Not very many.' He last downloaded pornography from the website on the preceding weekend. He stated that he did not have time to transfer those files to a disk and did not know what files were downloaded. [Defendant] identified the disk provided to the West Chicago Police Department by Ellen Bailey as belonging to him. [Defendant] denied manufacturing or distributing the child pornography video clips. The police seized seventy-seven (77) compact disks from [defendant's] residence, of which five (5) contained pornography, including adult pornography. The remainder of the disks contained music and information from [defendant's] employment.

The introduction of the testimony of Detective Lamela would be subject to [defendant's] objection on the same grounds presented in the defense Motion to Quash Arrest and Suppress Evidence and the subsequent Motion to Reconsider. [Defendant] requests the Court to reconsider and reverse its previous rulings concerning the admissibility of this evidence. [Defendant] objects to all evidence seized by the St. Charles Police Department from [defendant's] residence and to the statements made by [defendant] to the police because the evidence constitutes the illegal fruit of the unlawful search and seizure of the computer disk delivered to the police by Ellen Bailey.

[Defendant] does not stipulate to the sufficiency of the evidence to convict him of the offense charged."

The stipulation was signed by counsel for both parties but not by defendant. When the stipulation was given to the court, this exchange followed:

"THE COURT: The record should reflect that there appears to be a two-page stipulation, and Mr. Wechter, your client has not signed this.

MR. WECHTER: I have signed it on his behalf and [*sic*] special prosecutor for the State.

THE COURT: All right. And so Mr. Clendenin, you wish to be bound by the stipulation; is that correct?

THE DEFENDANT: Yes, it is, Your Honor."

The court took the matter under advisement.

On April 27, 2005, the court issued its decision and found defendant guilty of possession of child pornography.

## C. Posttrial Proceedings

On May 2, 2005, defendant, via his attorney Wechter, filed a posttrial motion reasserting that the trial court erroneously denied his motion to quash and suppress and arguing that the March 2005 stipulation was insufficient to support a conviction of possession of child pornography. On May 26, 2005, defendant dismissed Wechter as his attorney and Stephen Brundage was allowed to enter his substitute appearance on defendant's behalf.

On August 4, 2005, defendant, now represented by Brundage, filed his amended posttrial motion, adding two new claims. First, defendant asserted that the State breached its discovery duties by failing to timely disclose the audiotape of defendant's September 3, 2005, statement to Lamela and by providing defendant a materially inaccurate transcription of that statement several months prior to disclosing the audiotape. Second, defendant alleged that Wechter provided ineffective assistance of counsel in that he acquiesced to the State's discovery violation and did not challenge the State's case on the basis of the inaccuracies in the transcript. Wechter instead wrongly advised defendant to agree to a stipulated bench trial where he was not permitted to cross-examine the State's witnesses.

Defendant attached to the amended motion the transcript provided by the State (police transcript). The police transcript was prepared by Shari Lotito, a secretary at the St. Charles police department. To show the inaccuracies in the police transcript, defendant attached a transcript he arranged from another source (certified transcript), namely, a certified court reporter in Ohio. Defendant also attached an affidavit supporting his claim regarding the stipulated bench trial. In his affidavit, defendant averred that he was unaware of the content of either the September 2004 or the March 2005 stipulation until after he was found guilty in April 2005. Defendant stated that he "did not fully understand or agree with the process involved with the stipulation[s] filed with the Court because [he] wanted the opportunity to cross-examine witnesses who may testify against [him] and [he] wanted to present a defense on [his] behalf with the benefit of a full adversarial hearing."

The trial court denied the amended posttrial motion with respect to the suppression issue. The court held an evidentiary hearing on the remaining claims. The witnesses at that hearing included Wechter, defendant, Lamela, Lotito, and defendant's father, Charles Clendenin, Sr. (Clendenin). The evidence adduced covered these topics: the September 2004 and March 2005 stipulations, the timing of the disclosure of the audiotape to the defense, the discrepancies between the audiotape and the police transcript of the tape, the discrepancies

between both transcripts and Lamela's stipulated testimony, and the adequacy of Wechter's communication with defendant during the course of the case. We arrange the evidence by topic.

## 1. The Stipulations

Defendant, Clendenin, and Wechter testified regarding the September 2004 and March 2005 stipulations and the discussions among the three that led up to each stipulation. Defendant testified that, after the trial court denied his motion to quash and suppress, he and Wechter discussed how to proceed in the case. Wechter recommended that defendant agree to a stipulated bench trial. Wechter did not "thoroughly" explain what a stipulated bench trial was or use "definitions" in describing it. As defendant understood it, a stipulated bench trial "would preserve for appeal, I guess, an option. I'm not sure." Wechter also told defendant that he was going to call Clendenin, a former criminal defense attorney, to discuss defendant's options. Defendant told Wechter, "[W]hatever my father agrees, whatever is okay." Defendant ultimately agreed to a stipulated bench trial because he was not familiar with the legal system and "left it between [Clendenin and Wechter] to decide."

Defendant testified that, to his knowledge, the September 2004 stipulation "was supposed to include that [he] did not know that there was any child pornography whatsoever." The March 2005 stipulation, as he understood it, was to "add[ ] a clarification" to the September 2004 stipulation. Defendant never read, or otherwise learned the content of, either the September 2004 or the March 2005 stipulation until after he was found guilty by the court in April 2005. After the guilty finding, he obtained copies of both stipulations from the court file, read them, and became "furious" because the stipulations "basically admitt[ed] guilt" and he believed he was not guilty. Defendant testified that he had wanted a "trial in this case to determine [his] guilt or innocence" and the opportunity "to cross-examine witnesses that would have testified against [him] or the evidence that the State allegedly had." When asked if he "discuss[ed] the contents" of the September 2004 stipulation prior to April 2005, defendant replied, "Not the contents that were in that stipulation." Likewise, when asked if he "ever talk[ed] about what was in" the March 2005 stipulation prior to April 2005, defendant responded, "Not what was in this stipulation." Defendant testified that neither stipulation contained what defendant and Clendenin had "requested" of Wechter. For instance, the stipulation stated that defendant replied, " 'Not very many' " when asked by Lamela "if [defendant] knew how many video clips of child pornography were contained on the disks." Defendant

denied ever making this remark to the police and noted that it is not in the police transcript.

Defendant was asked about his colloquy with the court at the March 2005 stipulated bench trial:

> "Q. *** Do you remember being asked this question by the Court: 'Mr Clendenin, you wish to be bound by the stipulation; is that correct?'
>
> A. Yes.
>
> Q. You recall that question?
>
> A. I'm pretty sure.
>
> Q. And do you recall what your answer was?
>
> A. It was, 'Yes it is.'
>
> ***
>
> Q. What did you mean, 'Yes it is'?
>
> A. A stipulation, I guess. I don't know. I really don't—I am...
>
> Q. Did you intend to be bound by a stipulation you had never seen?
>
> A. I did not want to be bound by something with those contents.
>
> Q. The contents of which you found out later when you went to the Clerk's office?
>
> A. Yes. I was under the impression it was a different content."

Clendenin testified that, in July 2004, after the denial of the motion to quash and suppress, he and Wechter discussed possible courses of action. Wechter initially suggested that defendant change his plea to guilty. Clendenin described his reaction:

> "[A]fter I told him there was no way, I said 'First off, have you talked to [defendant] about changing his plea,' and he said 'Yes, I did talk to him and there's no way, he didn't want to change his plea.' I said—well, I just really got upset with him and I said, 'Well, what—what are you doing calling me, trying to get me talking him into changing his plea?' I said, you know, 'He's not guilty' and then—and then he says, 'Well—' uhm—uhm—'I think we should enter into a [s]tipulation, then,' and I never heard what a [s]tipulation was. I had prosecuted—prosecuted for 3 years and he's talking about an entire stipulation of a case, and I said—I just don't— that's ridiculous.
>
> Q. How did the conversation end?
>
> A. Well, I told him, I said, 'If the State wants to basically come to their senses and realize that my son told him over and over again that he did not possess any child pornography, didn't have a clue what they were talking about, if they wanted to agree to something like that, if they wanted to agree to that,' I mean, 'he's not changing his plea, he's—he's,' you know, 'He's told you he's going to keep his plea not guilty.' He's not changing it to guilty, and he's not stipulating to anything that is going to mean that he's guilty.'

Q. Did you—uhm—did that conversation then end?

A. Yes, basically, at that point, that's—that was if he could get the State to stipulate, come to their senses that [defendant] was not guilty, basically, and end the whole thing with that [s]tipulation, that was fine, or fine with me."

Clendenin testified that the "only [s]tipulation that we would accept was one where the State admitted that they were wrong, that they had—my son never possessed any child pornography and he didn't have a clue what was on there." Clendenin did not see either the September 2004 or the March 2005 stipulation until after defendant was found guilty, and only then because defendant got copies of the stipulations from the court file. Clendenin was "flabbergasted" at what the stipulations said. Clendenin testified that Wechter "never once told [defendant] what was in those [s]tipulations" and "totally blind-sided" defendant.

Wechter testified that, after the motion to suppress was denied, he discussed with defendant how to proceed. They had discussions in person, by mail, and over the phone. One of the options Wechter mentioned to defendant was a stipulated bench trial. Wechter said that he explained that procedure to defendant as follows:

"I explained to him that the primary purpose of a stipulated bench trial would be to preserve the Fourth Amendment issue that we had lost at the hearing on the motion to suppress.

That the parties would agree as to certain basic facts that would be presented if there were live testimony at a trial. That he should anticipate being found guilty at the conclusion of the stipulated bench trial.

And again, the primary purpose of it would be to then take an appeal to the appellate court on the legal issue we had presented to Judge Golden, *** trying to get her ruling overturned.

And if that succeeded, then the case would come back here with virtually all the evidence in the case suppressed, and the prosecution then being unable to prove him guilty of the charge."

Wechter also explained to defendant that a stipulation "include[s] certain facts pertaining to the case that would have been presented by live testimony before the Judge in court, [and] that this [is] a substitute for [the testimony]." Defendant had no questions of Wechter regarding the "mechanics" of a stipulated bench trial, and from what Wechter could tell, defendant understood the procedure. Wechter testified that he and defendant discussed the stipulation option over several months. "From time to time [defendant] would express some hesitation about it," but eventually he agreed to a stipulated bench trial.

Wechter explained how he decided on the content of the stipulation:

"I decided to include in the stipulation as minimal a factual basis for the State as I thought [the State] would be willing to accept. In other words, I did not include the entirety of the statement [defendant] gave to the police.

Instead, I selected certain portions from it to include in the stipulation. And I omitted a number of details that I thought would be harmful to his defense, but still enough that [the State] would accept the contents of the stipulation and present it to the Judge.

I also included some facts that I thought left the door open to argument, that the evidence was not sufficient to convict [defendant] of the charge."

Wechter was then asked what occurred after he and the State agreed on the initial, September 2004 stipulation:

"Q. Now once it was agreed upon—either before you prepared the—before you sent the stipulation to [the State], and before it was presented to the court, did you have occasion to meet with your client to show him the stipulation?

A. As far as the initial stipulation is concerned or the initial proposal to [the State] is concerned, I don't recall showing it to [defendant] beforehand.

Q. Had you ever shown [defendant] the stipulation that was presented to Judge Golden back in September of '04?

A. You know I am not certain, I am not certain whether I showed it to him or not. I'm thinking that I offered to show it to him, may have shown it to him, but that he didn't express much interest in looking at it. But I cannot tell you that for certain."

Regarding his conversations with defendant after the September 2004 stipulation was rejected, Wechter testified:

"Q. *** At the time that the second, the amended stipulation was submitted to Judge Golden, did you have occasion to sit down with your client and go over the contents of that stipulation, the amended one?

A. We discussed the nature of the change that was being made, with regard to some clarification about the exhibit or chain of custody, something along those lines. And we had a very long conversation outside this courtroom about whether he still wanted to proceed.

Q. And his response after that conversation or during that conversation was what?

A. He wanted to have a stipulated bench trial.

Q. Did you at any time show him that stipulation and identify what was concluded [sic] in it?
***

A. I would just have to give you the same answer I did last time about disclosing it to him. My last answer encompassed all the conversations we had about the document.

\* \* \*

Q. You never showed the written stipulation to [defendant] before you entered it with the court, did you?

A. Again, I'm not certain whether I offered to have him view it and he wasn't interested or whether he just didn't view it. I don't recall specifically.

Q. You didn't offer to have [defendant] sign the stipulation before you entered it with the court, did you?

A. I don't think so.

\* \* \*

Q. You had never provided a copy of that second stipulation to [defendant] before it was entered into with Judge Golden, did you?

A. I don't think I sent him a copy of it, no.

Q. Well, okay. Did you provide him a copy, whether you sent it or not or handed it to him in person?

A. As I indicated before, I am not certain whether he had an opportunity to view it before court, declined to view, or just did not have an opportunity to look at it. I don't recall.

\* \* \*

\*\*\* The morning that the second stipulation was entered into, we had a very lengthy conversation outside this courtroom and about whether he should enter into a stipulation or not.

Q. And the upshot of that conversation was what?

A. He did not want a contested trial of this case. He preferred to have a stipulation.

Q. That's in fact what you did \*\*\*?

A. After a lengthy conversation with him about whether he really wanted to do this or not, it was his decision to go ahead and to stipulate.

At that point, after having discussed everything with him that I thought was pertinent to the decision, it was no longer a question of my choice. It was his choice, and I was obligated as his lawyer to go ahead and do it.

\* \* \*

Q. And during that lengthy discussion, you do not recall whether you had showed him the stipulation?

A. I don't recall, no."

To show that Wechter adequately advised defendant with respect to a stipulated bench trial, the State introduced a series of letters Wechter sent defendant between May 2004 and March 2005. None of the letters, however, describe the content of either the September 2004 or the March 2005 stipulation. On September 2, 2004, Wechter wrote:

"I recommend that you consider a stipulated trial because of our poor chances of success if we participate in a full jury or bench trial. Since the State is now allowed to introduce the evidence of the film clips contained on your computer and computer disks, I do not think you have any realistic chance of success at trial. The only conceivable issue to be raised would be the question of your knowledge of the contents of the one film clip alleged in the State's complaint. In my opinion, this is not a viable issue because the police officer who interrogated you will testify that you admitted knowing the presence of at least some child pornography on the clips. In addition, I think it will be very difficult for a jury or a judge to objectively evaluate this defense after viewing the clips themselves.

*** [O]nce again, I do not think much will be gained for you by proceeding to trial.

On the other hand, if we succeed in reversing Judge Golden's ruling concerning the search and seizure on appeal, then the State will not have any evidence of child pornography that would be admissible at a re-trial.

If we proceed with the stipulated bench trial, then you should assume that the judge will find you guilty and sentence you for this felony offense.

* * *

*** After the judge makes a guilty finding, the case will be continued for a sentencing hearing. ***

As I noted, the purpose of the stipulated proceeding is to preserve our search and seizure claim for appeal. ***"

On March 17, 2005, the day after the second stipulation was presented to the trial court, Wechter wrote:

"Yesterday, we appeared in court again regarding your felony case. ***

Initially, you indicated that you had some reservations about proceeding with the stipulated bench trial. *** I repeated my earlier opinion that the contents of your statement and the nature of the charge would make it difficult to obtain an acquittal. I made sure you understood that you could defend the case on the basis of your lack of knowledge of the presence of child pornography on your computer disk. In addition, we could raise the search and seizure issue on appeal of any verdict of guilty. In other words, our previous strategy of staking the outcome of the case solely on an appeal of the search and seizure issue did not preclude you from also trying for an acquittal at a contested trial. I raised these concerns with you again on the morning of the court appearance before presenting the case to Judge Golden.

In both of our conversations, you repeatedly told me that you wanted to enter an amended stipulation to the evidence that would doubtless result in a guilty finding by the judge. You stated your desire to stake your chances of success in the case solely on the search and seizure issue."

## 2. The Audiotape and Transcripts

Defendant testified that, when he reviewed the police transcript, he noticed that it ascribed to him words and phrases he did not remember saying in his statements to police. Defendant asked Wechter "many times" to obtain the audiotape from the State so that Wechter and defendant could assess the accuracy of the police transcript. Wechter, however, did not obtain the audiotape until shortly before the presentation of the second stipulation on March 16, 2005—18 months after defendant's initial discovery requests in September 2003. Defendant first listened to the audiotape on March 17, 2005, and it confirmed his suspicion that the police transcript was inaccurate in material respects.

Clendenin testified that he received the audiotape from Wechter in the mail on March 17, 2005. The tape was indecipherable; the speakers sounded like "the Chipmunks." Clendenin took the tape to an audio professional who was able to make an intelligible copy for him. Clendenin then took the intelligible copy to a certified court reporter for a transcription. Clendenin found a discrepancy between the March 2005 stipulation and both transcripts in that neither of the latter relates defendant as saying "not very many" in response to a question from Lamela. Clendenin also found a discrepancy between the certified transcript and the police transcript. The police transcript contains the following exchange:

"Lamela: O.K. and approximately to your knowledge how much of the images on the disks contain child pornography? Which would be anyone under the age of seventeen engaging in active sexual penetration.

[Defendant]: Should be very few.

Lamela: Very few? O.K.

[Defendant]: Because normally they everything [sic] is labeled with twenty different keywords and. [sic]

Lamela: O.K.

[Defendant]: And um *several times they threw it in there*." (Emphasis added.)

By contrast, the certified transcript contains the following exchange:

"Q. Okay and approximately to your knowledge, how much of the images on the disks contain child pornography? Which would be anyone under the age of seventeen engaging in active sexual penetration?

A. Should be very few.

Q. Very few? Okay.

A. Because normally they—everything is labeled with twenty different keywords and—

Q. Okay. Have you—

A. —*sometimes they throw it in there.*" (Emphasis added.)

Clendenin considered "significant" the contrast between the phrases "several times they threw it in there" and "sometimes they throw it in there."

Lamela testified that, after he completed the tape-recorded interview with defendant on September 3, 2003, he gave the tape to Lotito, an administrative assistant with the St. Charles police department. Lamela received the police transcript on September 19, 2003. Lamela did not listen to the entire audiotape, but to his knowledge the police transcript was accurate. Lamela was asked whether, in any of the interviews on September 3, 2003, he asked how many video clips of child pornography defendant possessed and defendant answered "not very many." Lamela testified that this exchange occurred not in the audiotaped interview but in the prior, unrecorded, interview. Lamela's report of the unrecorded interview states in relevant part:

"I asked [defendant] how many compact disks he had in his apartment with pornography on it [*sic*]. [Defendant] stated that he has approximately 6 including the disk that I had possession of. I asked [defendant] if he knew how many video clips of child pornography he had on the disks and he stated, '*Not very many.*'" (Emphasis in original.)

Lamela's report was included in discovery disclosures to defendant.

Lamela also testified that the evidence log for the audiotape shows a notation, "listened by Larry Wechter," with a date of March 15, 2005.

Lotito testified that she routinely transcribed taped statements as a courtesy to the police officers. Lotito was neither a certified court reporter nor had she taken any courses in transcription. Lotito acknowledged that it was possible that the transcription she made of defendant's taped statement could contain errors.

Wechter testified to his efforts in obtaining the audiotape of defendant's statement to Lamela. On September 19, 2003, Wechter filed a general discovery motion. During the next four months, the State provided discovery to Wechter, including the police transcript of defendant's taped statement to Lamela. On September 2, 2004, Wechter wrote the prosecutor on the case, Michael Vujovich of the Office of the State's Attorneys Appellate Prosecutor, requesting that the State provide, prior to the trial date of September 23, 2004, the audio-

tape of defendant's statement. Wechter did not receive the audiotape by that date. Wechter made an appointment to listen to the tape on March 16, 2005. Later, he received a copy of the tape and mailed it to Clendenin. Wechter admitted that, in the 18 months between the initial discovery request and his appointment to listen to the tape, he never filed a motion to compel production of the tape. Wechter testified that, when he finally listened to the tape and compared it to the police transcript, he found "minor" discrepancies that "appeared *** not to have any impact of the thrust of the comments [defendant] made to the police."

### 3. Other Evidence of Ineffectiveness

Defendant testified that Wechter made little contact with him about the case. Defendant testified that, during the 2¹/₂ years Wechter represented him, he met only once with Wechter in Wechter's office. Any other meetings were conducted in the few minutes before or after a court appearance, in the hallway, and they lasted about 15 minutes each. Defendant also testified that he talked to Wechter on the phone a few times. Defendant noted that Wechter erroneously advised him that, if he were convicted, he would have to register as a sex offender for a period of 10 years. Actually, a conviction of possession of child pornography qualifies one as a "sexual predator" (730 ILCS 150/2(E)(1) (West 2002)), who must register as a sex offender for life (730 ILCS 150/7 (West 2002)).[2]

Following the testimony, the trial court issued a written decision denying the rest of defendant's posttrial motion. First, the trial court found no discovery violation by the State. The trial court reasoned that any undue delay in the release of the audiotape could not have prejudiced defendant, because the discrepancies between the police transcript and the certified transcript were "not dispositive on the element of [d]efendant's knowledge in light of other disclosures in the case," particularly defendant's response, "not very many," to Lamela's question how many discs in defendant's possession contained child pornography. Second, the court held that defendant agreed to a stipulated bench trial with full awareness of relevant considerations. The court specifically found:

> "[Defendant], after being advised by competent counsel, decided to dispose of his case through a stipulated bench trial. Defendant made this decision twice and indicated to the Court on both September 23, 2004, and March 16, 2005. Defendant did so on the latter date after a lengthy and exhaustive discussion with Attorney

---

[2]This specific instance of ineffectiveness was not alleged in defendant's posttrial motion, and the trial court did not specifically rule on it.

Wechter even though the Defendant's father, a retired attorney from a different state[,] did not agree before or after that date. Defendant now attempts with the aid of another attorney and hindsight after a finding of guilty to excise almost two years of this legal proceeding. Defendant was not deprived of his right to testify in his own defense. *** In the case at hand, Defendant's testimony lacks even an assertion that he wished to testify. Instead he is vague and has no clear memory of key points and conversations. Further, as ruled before,[3] this stipulated bench trial was no [sic] a plea of guilty requiring proper admonishments. Although a finding of guilty was possible as with any trial, the defense did not agree that the proof was sufficient to meet the State's burden of proof."

The court rejected the remaining grounds on which defendant alleged ineffectiveness. The court found that Wechter "kept his client [d]efendant appropriately appri[s]ed of the court proceedings and his suggested strategy in written correspondence." In these letters, the court found, Wechter "clearly set forth *** what had happened in court, what the suggested next step might be and thoroughly laid out the positive and negative of suggested strategies, most specifically the recommended stipulated bench trial."

Last, the court found that the stipulation contained proof beyond a reasonable doubt of defendant's possession of child pornography.

The matter moved to sentencing. Defendant received a sentence of 24 months of specialized sex offender probation, a $2,000 fine plus costs, and 62 days of incarceration in the county jail. Defendant filed a motion to reconsider his sentence, which was denied. He timely appeals.

## II. ANALYSIS

On appeal, defendant raises three issues. First, defendant contends that the trial court erred in denying his motion to quash and suppress. Second, defendant contends that Wechter provided ineffective assistance by: (1) preparing a stipulation with factual errors and that defendant never agreed to; (2) failing to challenge the State's discovery violations; and (3) misinforming defendant of the period of time he would be required to register as a sex offender. Third, defendant contends that the evidence presented by the stipulation was insufficient to support a conviction, because it failed to establish that he knowingly possessed child pornography.

### A. Motion to Quash and Suppress

When a reviewing court passes upon a trial court's ruling on a motion to suppress, it will reverse the trial court's findings of historical

---

[3]It is not clear to us where the court ruled previously on this issue.

fact only if they are against the manifest weight of the evidence. *People v. Phillips*, 215 Ill. 2d 554, 566 (2005). The ultimate question of whether the facts require the evidence to be suppressed, however, is reviewed *de novo. Phillips*, 215 Ill. 2d at 566.

The facts are undisputed. Bailey, who had limited authority to enter defendant's residence, took defendant's property, namely a CD and pinhole cameras, and, without defendant's permission, viewed video files on the disc. Bailey informed Malkin that she believed that defendant possessed child pornography and she gave Malkin the disc. Malkin, without a warrant and without defendant's consent, looked at the contents of the disc and determined that several of the files contained child pornography. Malkin contacted Lamela and provided him with the disc. Lamela too, without a warrant and without defendant's consent, viewed the contents of the disc and determined that it contained child pornography. Defendant asserts that these warrantless seizures and searches violated his constitutional right to be free from unreasonable searches and seizures. See U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, §6. We disagree.

The State relies extensively on *Phillips*, and we agree that it controls the outcome here. In *Phillips*, the defendant took his computer to have it repaired. *Phillips*, 215 Ill. 2d at 559. The technician who repaired the computer tested the repair by playing a video clip stored on the computer's hard drive. The video clip depicted what appeared to be a young girl engaged in a sexual act with a man while a woman looked on. The technician immediately contacted a police officer acquaintance, told him what he had seen, and asked him to come and look at it. *Phillips*, 215 Ill. 2d at 559.

When he arrived at the technician's shop, the officer, without first seeking a search warrant, had the technician play the video clip for him. The officer agreed that the video depicted child pornography and he informed other officers. *Phillips*, 215 Ill. 2d at 559. Two more officers arrived and, without a warrant, had the technician play the video for them, too. *Phillips*, 215 Ill. 2d at 559. The defendant was arrested when he returned to pick up his computer. *Phillips*, 215 Ill. 2d at 560.

The defendant gave to the police a voluntary statement admitting that he possessed child pornography, and he also consented to a police search of his home. The police discovered more child pornography, and, eventually, the defendant was indicted. *Phillips*, 215 Ill. 2d at 560.

The defendant filed a motion to suppress, arguing that the warrantless searches of his computer were illegal because the technician lacked the authority to consent to them. *Phillips*, 215 Ill. 2d at 560.

The trial court found, as an initial matter, that the technician's initial search of the computer was the act of a private citizen, not of an agent of law enforcement. *Phillips*, 215 Ill. 2d at 560-61. The trial court further found that the police viewed the same video as the technician, and, by doing so, the police acquired probable cause to arrest the defendant. The trial court denied the defendant's motion. *Phillips*, 215 Ill. 2d at 561.

■ The supreme court affirmed. Relying upon *United States v. Jacobsen*, 466 U.S. 109, 80 L. Ed. 2d 85, 104 S. Ct. 1652 (1984), the court noted that "[a] search by a private person does not violate the fourth amendment." *Phillips*, 215 Ill. 2d at 566. The court also noted that the "fourth amendment does not prohibit the government from using information discovered by a private search, because the private search has already frustrated any expectation that the information will remain private." *Phillips*, 215 Ill. 2d at 566. "[W]here the government uses privately discovered information to investigate a crime without first obtaining a warrant, the fourth amendment question is whether the investigation 'exceeded the scope of the private search.' " *Phillips*, 215 Ill. 2d at 566-67, quoting *Jacobsen*, 466 U.S. at 115, 80 L. Ed. 2d at 95, 104 S. Ct. at 1657.

The defendant argued that the police exceeded the scope of the private search by the computer technician because the technician did not provide the police with a " 'particular description' " of the contents of the file that he had viewed. The supreme court held that the technician's report to the initial officer at the scene, that the file contained what he considered child pornography, was description enough of the file's contents. In viewing the file, the police "gained no new material information" but "merely confirmed [the technician's] report that it appeared to be child pornography." *Phillips*, 215 Ill. 2d at 567. Thus, "learning with more precision what the video depicted did not take [the police] beyond the scope of [the technician's] search." *Phillips*, 215 Ill. 2d at 567.

■ In the case at hand, Bailey, acting privately and with no prompting from any government agent, took defendant's CD to her own home. There, she viewed the titles of the files on the disc and, in particular, watched one video clip in which a minor girl appeared to engage in sexual activity with an adult man. Under *Phillips*, Bailey's seizure of the disc and search of its contents were the acts of a purely private person and did not themselves implicate the fourth amendment. *Phillips*, 215 Ill. 2d at 566.

The issue rather is whether Malkin or Lamela exceeded the ambit of Bailey's private search. *Phillips*, 215 Ill. 2d at 566-67. Defendant first argues that the incriminating nature of the disc was not readily

apparent to Malkin or Lamela. Defendant notes that the disc was not marked or otherwise distinguished as containing child pornography. This point has no merit. The computer in *Phillips* was similarly devoid of any external sign that it contained child pornography on its hard drive, but the police searches there were valid nonetheless.

Defendant's next point is more subtle. He argues that Malkin's and Lamela's searches of the disc were "fishing expeditions" not restricted to the areas Bailey had searched. Here defendant and the State both rely on *Jacobsen*. There, Federal Express (FedEx) employees opened a damaged container pursuant to company policy and found a tube made of duct tape packed in crumpled newspaper. The FedEx employees opened the tube and found plastic bags containing white powder, which they believed to be contraband. They placed the tube and packaging back into the box and contacted the Drug Enforcement Agency (DEA). *Jacobsen*, 466 U.S. at 111, 80 L. Ed. 2d at 92, 104 S. Ct. at 1655. A DEA agent arrived and took the tube from the package, removed the plastic bags through the slit that had been made in the tube by FedEx employees, and field-tested the white powder for the presence of cocaine. Other agents then arrived. *Jacobsen*, 466 U.S. at 111-12, 80 L. Ed. 2d at 93, 104 S. Ct. at 1655.

The Supreme Court held that, while the DEA's assertion of control over the package constituted a seizure, it was reasonable. The Court recognized that it was "not entirely clear that the powder was visible to [the agent] before he removed the tube from the box." *Jacobsen*, 466 U.S. at 118, 80 L. Ed. 2d at 97, 104 S. Ct. at 1659. This, however, did not invalidate the search:

> "Even if the white powder was not itself in 'plain view' because it was still enclosed in so many containers and covered with papers, there was a virtual certainty that nothing else of significance was in the package and that a manual inspection of the tube and its contents would not tell him anything more than he already had been told." *Jacobsen*, 466 U.S. at 118-19, 80 L. Ed. 2d at 97-98, 104 S. Ct. at 1659.

The Court further noted that "[t]he agents had already learned a great deal about the contents of the package from the Federal Express employees, all of which was consistent with what [the agents] could see." *Jacobsen*, 466 U.S. at 121, 80 L. Ed. 2d at 99, 104 S. Ct. at 1660. Thus, "[i]t hardly infringed [the defendants'] privacy for the agents to reexamine the contents of the open package by brushing aside a crumpled newspaper and picking up the tube." *Jacobsen*, 466 U.S. at 119, 80 L. Ed. 2d at 98, 104 S. Ct. at 1659. "Similarly, the removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previ-

ously been learned during the private search." *Jacobsen*, 466 U.S. at 120, 80 L. Ed. 2d at 98, 104 S. Ct. at 1660.

Applying *Jacobsen* to this case, defendant claims that the testimony of Malkin and Lamela does not indicate that their searches were limited to the areas of the disc that Bailey had searched. Defendant notes that Malkin and Lamela both claimed to have viewed a video file from the disc but neither indicated that they viewed the same file Bailey viewed. This contrasts with *Phillips*, defendant contends, because in that case the police viewed the same video file the technician viewed. Defendant stresses that, unlike in *Jacobsen*, there was not "a virtual certainty that nothing \*\*\* of significance" besides child pornography was contained on the disc.

We question defendant's premises. First, defendant appears not to appreciate the full scope of Bailey's search. Bailey's testimony suggests that, in addition to viewing a video file containing apparent child pornography, she searched the disc widely enough to ascertain several "disturbing" file names also suggestive of child pornography, such as " 'mother f---s 8-year-old' " and "something about toddler daycare." We are not persuaded that Bailey's search lacked sufficient scope to warrant the police conducting a general review of the files on the disc for the presence of child pornography. Defendant certainly has not convinced us that Malkin and Lamela searched anywhere on the disc that by designation (*e.g.*, file name) likely would not contain child pornography. Second, defendant maintains that the disc "could have contained vast amounts of personal information" belonging to him, but he does not point to any evidence in the record suggesting so. Under these facts, *Jacobsen* supports the State, not defendant.

Defendant also argues that Bailey had to have actual authority or apparent authority to consent to a police search of defendant's disc, and since she undisputably had neither, Malkin's and Lamela's actions were improper. Defendant misconceives the requirement of consent. As we determined above, Bailey's seizure and review of the disc were not state action. When Bailey presented the disc to Malkin and Lamela, she had already frustrated defendant's expectation of privacy. *Phillips*, 215 Ill. 2d at 566; see *Jacobsen*, 466 U.S. at 117, 80 L. Ed. 2d at 96, 104 S. Ct. at 1658-59 ("The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated"). The question, therefore, is not whether Bailey had authority to give Malkin and Lamela the disc but whether their searches of the disc exceeded her prior, private search. We determined above that their searches were proper.

Based on the foregoing, we conclude that the trial court properly denied defendant's motion to quash and suppress. The police action

here did not exceed the scope of the private search conducted by Bailey; it only confirmed the results of Bailey's private search.

## B. Ineffective Assistance

Defendant next argues that Wechter provided ineffective assistance. Whether counsel provided ineffective assistance is a mixed question of fact and law. *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). We review the trial court's findings of fact to determine whether they are against the manifest weight of the evidence; we review *de novo* the ultimate question of whether counsel's actions support the ineffectiveness claim. *People v. Bailey*, 375 Ill. App. 3d 1055, 1059 (2007). We consider the ineffectiveness claim under the familiar two-part standard enunciated in *Strickland v. Washington*, 466 U.S. 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984): to prevail on a claim of ineffective assistance, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Bailey*, 375 Ill. App. 3d at 1059. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Davis*, 353 Ill. App. 3d at 795-96.

Defendant first contends that Wechter was ineffective for failing to present the March 2005 stipulation to him for approval prior to its submission to the court. Defendant insists that he would not have approved the stipulation had he known its content, particularly the statement that, if called as a witness, Lamela would testify that defendant admitted to possessing "not very many" files of child pornography. Defendant asserts that he never intended to waive his right to cross-examine State witnesses such as Lamela. He contends that Wechter's failure to disclose the content of the stipulation beforehand was not ameliorated by any aspect of the March 16, 2005, hearing because the content of the stipulation was not discussed at all in open court. Defendant argues that the March 2005 stipulation effected a waiver of his right of confrontation, and that the waiver was involuntary and unknowing on two scores: (1) defendant was unaware of what the stipulation contained, and (2) the stipulation was tantamount to a plea of guilty yet the court did not admonish him per Supreme Court Rule 402 (177 Ill. 2d R. 402).

In response, the State contends: (1) the stipulation was not tantamount to a plea of guilty and thus no admonishments were needed; and (2) the evidence at the posttrial hearing showed that Wechter adequately informed defendant of the nature of a stipulated bench trial and its consequences.

We agree with defendant that the record shows that he was never apprised of the specific content of the stipulation. Defendant, therefore, could not have meaningfully decided whether to object to the stipulation, as he had a right to do under *People v. Campbell*, 208 Ill. 2d 203 (2003), *aff'g People v. Campbell*, 332 Ill. App. 3d 808 (2002). As we explain below, for defendant to have been left in ignorance of the specific content of the stipulation was a violation of his constitutional right of confrontation as construed in *Campbell* and other cases. This error is sufficient in itself to require reversal of defendant's conviction. Defendant additionally argues, as we noted, that the March 2005 stipulation was tantamount to a guilty plea and that he did not receive proper plea admonitions. *Campbell* and its progeny, we believe, have fundamentally altered the criteria for determining when a stipulation is of such consequence that it necessitates admonitions under Rule 402. Below, we offer some observations on *Campbell*'s impact.

### 1. Whether Defendant Knew the Specific Content of the March 2005 Stipulation

Both the United States and Illinois Constitutions preserve the right of an accused to confront the witnesses against him. See U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 111 L. Ed. 2d 666, 678, 110 S. Ct. 3157, 3163 (1990). The right of confrontation may be waived, as by a stipulation to the admission of evidence, but according to the supreme court in *Campbell*, 208 Ill. 2d at 217-18, the criteria for waiver vary with the degree to which confrontation is relinquished.

In *Campbell*, a victim of the alleged crime was unavailable to testify. The State crafted a stipulation reciting what testimony the victim would have given had he appeared. When the State announced the stipulation, the trial court asked defense counsel whether he agreed to the stipulation. The trial court did not ask the defendant himself if he consented. Defense counsel declared his assent to the stipulation, and it was read to the jury. *Campbell*, 208 Ill. 2d at 208. Following his conviction, the defendant argued that "any waiver of the right to confrontation must be a knowing waiver made by the defendant personally" and so the waiver was invalid because it was not secured from the defendant himself. *Campbell*, 208 Ill. 2d at 212.

The court declined to hold that the right of confrontation must always be waived by the defendant personally. The court

explained by first noting that "criminal defendants possess two types of constitutional rights and that a different waiver standard applies to each." *Campbell*, 208 Ill. 2d at 210. These rights were previously catalogued by the court in *People v. Ramey*, 152 Ill. 2d 41 (1992). *Ramey* explained that there are four decisions that "are ultimately for the defendant in a criminal case after full consultation with his attorney": (1) what plea to enter; (2) whether to waive a jury trial; (3) whether to testify in his own behalf; and (4) whether to appeal. *Ramey*, 152 Ill. 2d at 54. *Ramey* went on:

> "Beyond these four decisions, however, trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client. Such matters include what witnesses to call, *whether and how to conduct cross-examination*, what jurors to accept or strike and what trial motions should be made. [Citation.] Such matters also include the defense to be presented at trial." (Emphasis added.) *Ramey*, 152 Ill. 2d at 54.

Finding it a matter of first impression in Illinois "whether defense counsel may waive a defendant's right of confrontation by stipulating to the admission of evidence," the court turned to foreign authority. *Campbell*, 208 Ill. 2d at 212. The court determined that the majority stance in both state and federal courts is that "counsel in a criminal case may waive his client's sixth amendment right of confrontation by stipulating to the admission of evidence as long as the defendant does not object to or dissent from his attorney's decision, and where the decision is a matter of legitimate trial tactics or prudent trial strategy." *Campbell*, 208 Ill. 2d at 220-21. The court adopted this position. *Campbell*, 208 Ill. 2d at 217. In *People v. Phillips*, 217 Ill. 2d 270, 288 (2005) (*Phillips III*), *reversing People v. Phillips*, 352 Ill. App. 3d 867 (2004) (*Phillips II*), the supreme court reinforced *Campbell*'s holding. (The appellate court's original decision in the case, *People v. Phillips*, 326 Ill. App. 3d 157 (2001) (*Phillips I*), was vacated by the supreme court in *People v. Phillips*, 208 Ill. 2d 550 (2004).)

We discuss below what it means for a decision to stipulate to be "a matter of legitimate trial tactics or prudent trial strategy" and what consequences flow where a stipulation does not meet that criterion. Our present concern is the minimal condition that *Campbell* places on any stipulation, *i.e.*, that the defendant not object to it. As we read *Campbell* and *Phillips III*, a defendant's decision not to object to a stipulation must be a meaningful decision. The supreme court, in *Campbell* and especially in *Phillips III*, stresses that, where a stipulation is a matter of sound trial tactics or strategy, a defendant need not be advised about the procedural ramifications of stipulations in general

or about the consequences of a proposed stipulation for that particular case. See *Phillips III*, 217 Ill. 2d at 286; *Campbell*, 208 Ill. 2d at 221. Although neither *Campbell* nor *Phillips III* holds so expressly, we believe it is tacit in those decisions that no stipulation (regardless of its tactical or strategical worth) may be validly accepted by the court unless the defendant is apprised of the specific content of the stipulation.

Our primary guidepost here is *Phillips III*, which clarified *Campbell* on the precise question of what a defendant must know at a minimum for a stipulation to be valid. In *Phillips III*, defense counsel stipulated to lab findings establishing that the substance found in the defendant's car contained cocaine and cannabis. *Phillips III* corrected what it considered a misreading of *Campbell* by the appellate court. The appellate court had held that a defendant's tacit acquiescence while a stipulation is tendered to the court is insufficient to effect a valid waiver of confrontation rights. The "absence of an objection" alone is inadequate; rather, "there must be some affirmative showing or indication by the defendant in the record that he or she did not object to or dissent from the attorney's decision to stipulate." *Phillips II*, 352 Ill. App. 3d at 871-72. The appellate court derived this requirement from *Ramey*'s holding that the ultimate decision on matters of trial tactics and strategy belongs to defense counsel " 'after consulting with his client.' " *Phillips II*, 352 Ill. App. 3d at 871, quoting *Ramey*, 152 Ill. 2d at 54. The court elaborated:

> "[T]he requirement of a voluntary, knowing and intelligent waiver is inherent in defendant's *election* not to object to stipulating and *** there needs to be some evidence in the record that defendant knowingly waived. That is to say that he or she was advised of the right to confront witnesses and of the nature and legal impact of waiving that right through the proposed stipulation, and either concurred with or objected to it." (Emphasis in original.) *Phillips II*, 352 Ill. App. 3d at 871.

The court observed that, where the defendant is not so admonished, there is little chance that his or her failure to object to a stipulation will be meaningful:

> "[T]he defendant [here] would have needed a combination of some rudimentary understanding of the legal concept of stipulation (which we do not believe can be fairly assumed) and enough luck to 'alert' to the word in the course of the trial. Such a hit or miss proposition simply cannot result in either a reasoned objection or a knowing and voluntary assignment of her right to waive confrontation to her attorney, and we do not believe that it was the intent of our supreme court to validate a complete disregard of a defendant's interest in this constitutional right." *Phillips II*, 352 Ill. App. 3d at 872.

The court found that the trial court's failure to admonish the defendant with regard to the rights impacted by the stipulation was not remedied through discussions with her attorney:

"[A] review of the record in the present case discloses nothing that demonstrates (or even suggests) that [the defendant's] attorney explained to [her] what decisions were generally made by him absent her objection or, more specifically, what a stipulation is and its legal impact, what he intended to stipulate to, and what the implications were of stipulating to the specific data in the lab reports. A failure to provide the defendant with that basic information deprives her of a meaningful opportunity to make a reasoned objection. Nor is there any representation by the attorney to the court that he discussed these matters with his client and she did not object." *Phillips II*, 352 Ill. App. 3d at 872.

The supreme court in *Phillips III* held that the appellate court had unwarrantedly expanded *Campbell*'s strictures:

"[W]e held [in *Campbell*] that a defendant must *personally* waive the right of confrontation 'when the State's entire case is to be presented by stipulation and the defendant does not present or preserve a defense ***, or where the stipulation includes a statement that the evidence is sufficient to convict the defendant.' [Citation.] We attached no other restrictions to defense counsel's authority to stipulate to the admission of evidence, and, except in those specified instances, where the stipulation is tantamount to a guilty plea, we imposed no obligations on the trial court or counsel to admonish the defendant and ensure that the advisement is made a part of the record. Insofar as the appellate court held otherwise, the court erred." (Emphasis in original.) *Phillips III*, 217 Ill. 2d at 283.

The court noted that the appellate court's holding logically would extend beyond the use of stipulations, causing criminal trials to be bogged down in consultations between defense counsel and the defendant:

"[I]f we were to interpret the quoted passage from *Ramey* as the appellate court did, decisions regarding 'what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike and what trial motions should be made' [(*Ramey*, 152 Ill. 2d at 54)] would all, logically, require consultation with defendant, and his tacit approval, on the record. Since an evidentiary stipulation is, in effect, nothing more than an acknowledgment of what a witness would testify to if called, and a concomitant decision not to challenge the testimony the witness would give, a stipulation is not much different from a decision not to cross-examine. The notion that a defendant would have to ap-

prove every aspect of defense counsel's cross-examination—including 'whether and how to conduct cross-examination' [(*Ramey*, 152 Ill. 2d at 54)]—highlights the impracticality of the procedure espoused by the appellate court. A representative system of litigation cannot function with those restrictions. We decline to impose them, and we hold that they are not constitutionally required." (Emphasis omitted.) *Phillips III*, 217 Ill. 2d at 284.

Summarizing its holding, the court stated that, unless a stipulation is the " ' "practical equivalent of a plea of guilty," ' "[4] it is not necessary "for either the court or counsel to admonish [a] defendant about the implications and consequences of [a] stipulation," and the "defendant's personal agreement to the stipulation on the record [is] not required." *Phillips III*, 217 Ill. 2d at 287, quoting *Campbell*, 208 Ill. 2d at 218, quoting *Brookhart v. Janis*, 384 U.S. 1, 7, 16 L. Ed. 2d 314, 319, 86 S. Ct. 1245, 1248 (1966).

The court proceeded to find that defense counsel's stipulation to the lab reports was "a matter of trial strategy," the remaining issue being whether the defendant objected to the stipulation. *Phillips III*, 217 Ill. 2d at 286. The court noted that the defendant did not object during any of the multiple times that defense counsel referred to the stipulation in open court:

"[W]e note that defendant was present when the prosecutor, in his opening statement, mentioned 'an agreement between the State and the defense counsel' regarding the testimony of people who handled and tested the drugs found in defendant's car. On four occasions, the prosecutor referred to stipulations concerning that evidence. Defendant did not voice any dissent or objections when those remarks were made. Defendant was also present when defense counsel announced he had no objection to admission of the lab reports. Again, defendant did not object." *Phillips III*, 217 Ill. 2d at 286-87.

As emphatically as *Phillips III* rejected the holding in *Phillips II*, we do not read the supreme court as leaving a defendant entirely to self-help in assessing whether to accept a stipulation where he lacks the benefit of formal admonishments. The specific holding of *Phillips III* is that neither the court nor defense counsel is required to "admonish [the] defendant about the *implications and consequences* of a stipulation." (Emphasis added.) *Phillips III*, 217 Ill. 2d at 288. The design here was not to absolve the court and defense counsel of all responsibility to inform the defendant with respect to a stipulation.

---

[4]It seems that, in the usage of *Campbell* and *Phillips III*, any stipulation that constitutes poor trial tactics or strategy is *per se* the practical equivalent of a guilty plea. We address this in greater length below.

We see this from *Campbell*, whose holding *Phillips III* claimed to be applying straightforwardly. Implicit in *Campbell*, and by extension *Phillips III*, is the requirement that the defendant be informed of the specific content of the stipulation.

To explain this, we look first at the series of foreign authorities whose holdings *Campbell* adopted without qualification. *Campbell* relied on state and federal decisions upholding stipulations presented by defense counsel while the defendant was present but did not object. The first of the state decisions cited by *Campbell* was *Carr v. State*, 829 S.W.2d 101 (Mo. App. 1992). *Campbell* evidently considered *Carr* representative of state decisions on the issue, for *Carr* is discussed in detail while the remaining decisions are placed in a string citation. In *Carr*, defense counsel stipulated to portions of a witness's deposition testimony. The defendant in *Carr* (as specifically recounted by *Campbell*) listened "patiently" as the stipulated portions of the deposition were read to the jury, and he voiced no objection. *Carr*, 829 S.W.2d at 102. The appellate court held that the proceeding satisfied the requirement that a stipulation to evidence be " 'knowing, intelligent, and voluntary' " on the part of the defendant. *Carr*, 829 S.W.2d at 103, quoting *State v. Loggins*, 647 S.W.2d 551, 556 (Mo. App. 1982).

While in many contexts the phrase "knowing, intelligent, and voluntary" presupposes an understanding not just of the details of a course of action but also of its procedural consequences, *Carr* evidently did not have that broader concept in mind, for there was no indication that the defendant understood the nature of the right he was relinquishing or the procedural implications of that waiver. It apparently sufficed for the court in *Carr* that the defendant knew the content of the stipulation, and it was this minimalist notion of "knowing, intelligent, and voluntary" that *Campbell*, we believe, adopted in approving *Carr* without qualification.

Further support for this reading of *Campbell* is found in another state decision it cited, *Bilokur v. Commonwealth*, 221 Va. 467, 270 S.E.2d 747 (1980). In *Bilokur*, "[w]ith the defendant standing mute," defense counsel stipulated to the admission of a transcript of the victim's interview with the State and defense counsel. *Bilokur*, 221 Va. at 469, 270 S.E.2d at 749. The Supreme Court of Virginia said:

> "[T]he record leaves no doubt that [the defendant] acquiesced in that decision. *** *There is nothing to show that he was unfamiliar with the content of the transcript* or that he had any reason to impeach [the victim's] statement by cross-examination. Applying the rule we have adopted, we conclude that [the defendant's] silence was tantamount to assent." (Emphasis added.) *Bilokur*, 221 Va. at 474, 270 S.E.2d at 752.

Like *Carr*, *Bilokur* evidently was not concerned with whether the defendant understood the full procedural implications of stipulating. The court indeed was concerned, however, with whether the defendant knew the content of the stipulation.

Notably, none of the remaining state decisions cited in *Campbell* found a stipulation valid where it was apparent that the content of the stipulation was unknown to the defendant when it was submitted. See, *e.g.*, *Lee v. State*, 266 Ark. App. 870, 876-77, 587 S.W.2d 78, 81-82 (1979) (stipulated evidence recited in open court with the defendant present); *State v. Bromwich*, 213 Neb. 827, 830, 331 N.W.2d 537, 540 (1983) (defendant "admitted to the truth of the stipulated facts in open court").

The same is true of the federal decisions cited in *Campbell*. See, *e.g.*, *Hawkins v. Hannigan*, 185 F.3d 1146, 1150, 1154 (10th Cir. 1999) (stipulation, which was signed by both defense counsel and the defendant, was read into the record in the defendant's presence); *United States v. Stephens*, 609 F.2d 230, 233 (5th Cir. 1980) (stipulation read in open court with the defendant present); *Wilson v. Gray*, 345 F.2d 282, 283 (9th Cir. 1965) (in presence of the defendant, defense counsel stipulated to trial based on transcript of preliminary hearing). In two decisions since *Wilson*, the Ninth Circuit upheld a stipulation while specifically noting that the defendant apparently understood the contents of the stipulation. See *Adams v. Peterson*, 968 F.2d 835, 844 (9th Cir. 1992) (holding that "[a] stipulation is valid and binding if the defendant understands the contents of the stipulation, the nature of the stipulated-facts trial, and the likelihood of a guilty finding"; noting that the defendant read the stipulation before it was submitted); *United States v. Meyer*, 802 F.2d 348, 350 (9th Cir. 1986) ("There is no indication that the stipulation was involuntary or that the defendant was unaware of its contents").

It is also apparent that in both *Campbell* and *Phillips III* the specific content of the stipulation was known to the defendant when it was submitted. In *Campbell*, the victim's stipulated testimony "was read to the jury" in the defendant's presence. *Campbell*, 208 Ill. 2d at 208. In *Phillips III*, the lab tests were described on the record and the stipulation was subsequently referred to several times during the trial—all while the defendant was present. *Phillips III*, 217 Ill. 2d at 276, 286-87; *Phillips II*, 352 Ill. App. 3d at 868; see *Phillips I*, 326 Ill. App. 3d at 161. Not only, then, is there positive evidence that the supreme court in *Campbell* meant to ensure that the defendant, either through defense counsel or the trial court, knows the specific content

444

of a stipulation, such a rule is entirely consistent with the facts and outcomes in *Campbell* and *Phillips III*.[5]

■ We note carefully the narrowness of our holding. If a stipulation impacts the right of confrontation, the defendant's failure to object will not be construed as acquiescence to defense counsel's waiver unless the record clearly shows that the defendant was apprised of the specific content of the stipulation. As for how that showing is made, we do not prescribe any particular method. The stipulation's content may be conveyed to the defendant by the court or by defense counsel, but to establish a sure record we recommend that the stipulation be read on the record in the defendant's presence or that the defendant be provided an opportunity on the record to review the stipulation and to object if he so desires. In accordance with *Phillips III*, procedural admonishments are not required where the stipulation is a matter of sound trial tactics or strategy. Nor do we require that the defendant affirmatively accept the stipulation on the record; under *Campbell* and *Phillips III*, the absence of an objection is sufficient.

We are also careful to note that our holding does not lead to the "impracticality" highlighted in *Phillips III*, that is, a trial mired in defense counsel's constant consultation with the defendant over when and how to cross-examine. We do not require counsel to consult with the defendant regarding the wisdom of a stipulation. We require only that the defendant be apprised, by whatever means, of the specific content of the stipulation. This does not entail any alteration in how cross-examinations are customarily done; it only places stipulations on par with that customary practice. If a defendant is present in court, he will *a fortiori* know the content of any testimony that defense counsel may choose not to challenge through cross-examination; we require no less and no more when a stipulation is proffered.[6]

---

[5]The appellate court in *Phillips II* stressed that defense counsel never informed the defendant "what he intended to stipulate to." *Phillips II*, 352 Ill. App. 3d at 872. We do not believe that the supreme court, in repudiating the appellate court's holding, was indifferent to whether the defendant knew the content of the stipulation. Quite the opposite is apparent. As we noted, the content of the stipulation was conveyed on the record, and the supreme court stressed the number of times the stipulation was mentioned in open court. It seems rather that the supreme court was rejecting the appellate court's notion, which it derived from *Ramey*, that counsel must consult with the defendant regarding the proposed stipulation.

[6]*Ramey* suggests that a defendant may not override defense counsel's decisions on whether and how to cross-examine. If, as *Phillips III* suggests, a decision to stipulate is tantamount to a decision not to cross-examine, there

The record here shows that defendant was unaware of the specific content of the March 2005 stipulation when it was submitted to the trial court. The trial court, we note, made findings of fact relative to the stipulation issue, and we may not upset them unless they are against the manifest weight of the evidence. See *Bailey*, 375 Ill. App. 3d at 1059. Although the trial court found that defendant made the decision to stipulate after being "advised by competent counsel," the court did not address the specific question of whether defendant was ever informed of what the stipulation actually contained. In fact, there is no indication that the trial court was even aware that it was necessary that defendant know the specific content of the stipulation. There is, therefore, no factual finding on this particular point to which we must defer.

■ The hearings at which the September 2004 and March 2005 stipulations[7] were submitted do not reflect any effort to ensure that defendant knew the content of either stipulation. Neither stipulation was read on the record. Defendant did not sign the March 2005 stipulation. Defendant did sign the September 2004 stipulation but not until the hearing was in progress, and there is no indication that he reviewed the document when he signed it. Notably, defendant categorically denied that he ever reviewed the content of either stipulation, and Wechter, as we note below, never contradicted this. We also note that at neither hearing was the stipulation's content discussed in any detail or did the trial court ask defendant whether he was aware of its content.

Equally lacking is evidence that defendant learned from Wechter the true content of either stipulation before the March 2005 version

---

rises the question of why a defendant may override the one but not the other. See 3 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §11.6(a), at 783 n.49 (3d ed. 2007) ("the courts have not explained why defendant's lack of objection should be crucial here [*re* stipulations] when it apparently has no bearing on counsel's control over decisions relating to the cross-examination of the persons who testify at trial"); see also *People v. Rowell*, 375 Ill. App. 3d 421, 436-44 (2006) (Steigmann, J., specially concurring), *rev'd*, 229 Ill. 2d 82 (2008) (viewing the decision whether to enter into a stipulation (short of a guilty plea) "as merely one of several important judgments defense counsel may be called upon to make during trial" (*Rowell*, 375 Ill. App. 3d at 442) and questioning whether *Campbell*'s suggestion that a defendant can override his counsel's decision to stipulate is reconcilable with *Ramey*'s holding that tactical and strategic decisions are ultimately the province of defense counsel).

[7]Defendant's awareness of the September 2004 stipulation is relevant because the parties agree it was given only a minor change before being resubmitted to the court in March 2005.

was submitted to the court. Defendant testified that, though he discussed with Wechter the option of a stipulated bench trial, he essentially left the decision to his father, Clendenin. Defendant testified that, from his understanding, the stipulation "was supposed to include that [he] did not know that there was any child pornography whatsoever." Defendant was shocked to learn that Wechter had included in the stipulation defendant's statement to Lamela, and he felt that the stipulation essentially conceded his guilt.

Clendenin's conception of what the stipulation was supposed to say was pointedly similar to defendant's. Clendenin testified that he stressed to Wechter that the only stipulation acceptable to defendant would be "one where the State admitted that they were wrong, that they had—my son never possessed any child pornography and he didn't have a clue what was on there." When Clendenin finally discovered what the stipulations contained, he felt that Wechter had "totally blind-sided" defendant. We note that what Clendenin really wanted, it seems, was a dismissal of charges rather than a stipulation. Be that as it may, Clendenin's testimony shows at least that, like defendant's, his understanding of what the stipulations were supposed to contain was radically different from what Wechter ultimately included in them.

We dispute the trial court's observation that defendant was "vague and ha[d] no clear memory of key points and conversations." The trial court did not point to any specific testimony here. As we see the record, defendant and Clendenin testified consistently and emphatically that they were never informed what was in the stipulations until after the March 2005 hearing and that the actual content of each stipulation was far different from what they assumed it would be.

The trial court evidently favored Wechter's testimony over defendant's and Clendenin's, but actually Wechter's testimony was entirely consistent with theirs on the crucial point. Wechter testified to multiple conversations with defendant over whether to insist on a full adversarial trial or instead agree to a stipulated bench trial. Wechter testified that he described to defendant the concept of a stipulated bench trial. He told defendant that the parties "would agree to certain facts that would be presented if there were live testimony at trial." Wechter, however, never claimed that defendant read either stipulation before the March 2005 stipulation was submitted to the court. Wechter could not say for sure whether he ever offered either stipulation to defendant for review. For instance, he did not think that he ever sent the March 2005 stipulation to defendant. Wechter also never affirmatively maintained that he discussed with defendant the full content of either stipulation. In its findings, the trial court stressed that the March 2005 stipulation was entered "after

a lengthy and exhaustive discussion" between Wechter and defendant. This we take was a reference to Wechter's claim that he did "sit down with [defendant] and go over the contents of [the March 2005 stipulation]" in the morning before it was submitted. As to what was discussed, however, Wechter testified: "We discussed the nature of the change that was being made, with regard to some clarification about the exhibit or chain of custody, something along those lines." This was no sure assertion that defendant was apprised of the full substance of the stipulation. In this respect, the conversation was hardly "exhaustive."

Similarly, Wechter's letters to defendant do not disclose the content of either stipulation or allude to any instance where Wechter described its substance to defendant. In the letters, Wechter references various details of the State's case against defendant, including his admissions to Lamela, but Wechter does not mention what he proposes to include in the stipulations. We recognize that, on March 17, 2005, Wechter wrote: "In both of our conversations, you repeatedly told me that you wanted to enter an amended stipulation to the evidence that would doubtless result in a guilty finding by the judge." Wechter does not, however, relate what evidence defendant supposedly wanted to include in the stipulation here mentioned.

Thus, the record shows that defendant was unaware of the specific content of the stipulation when it was accepted by the trial court on March 16, 2005. Therefore, his failure to object to the stipulation cannot be construed as the informed acquiescence required by *Campbell*. In the language of *Strickland*, we hold that Wechter's handling of the stipulations fell below a reasonable standard of representation. We note that the trial court implies in its findings that any shortcomings in Wechter's representation could not have prejudiced defendant because he never claimed that "he wished to testify" in his own defense. The right defendant asserts here, however, is not his right to testify but his right to confront the witnesses against him. Defendant expressly testified that he wished to cross-examine the State's witnesses, particularly Lamela on his claim that defendant made incriminating remarks.

## 2. Whether the March 2005 Stipulation Was Tantamount to a Guilty Plea

Defendant's alternative argument is that the March 2005 stipulation was tantamount to a guilty plea, thereby entitling him to admonitions per Rule 402. Because we believe the repercussions of *Campbell* and *Phillips III* for stipulations are significant but have yet to be fully explored in any published decision, we offer our view of what the law currently holds in the wake of *Campbell* and *Phillips III*.

As we noted, *Campbell*'s core holding is:

> "[C]ounsel in a criminal case may waive his client's sixth amendment right of confrontation by stipulating to the admission of evidence as long as the defendant does not object to or dissent from his attorney's decision, and where the decision to stipulate is a matter of legitimate trial tactics or prudent trial strategy." *Campbell*, 208 Ill. 2d at 220-21.

When is a stipulation "a matter of legitimate trial tactics or prudent trial strategy"? The supreme court gives content to the phrase by first discussing the United States Supreme Court's decision in *Brookhart*. In *Brookhart*, the State and defense counsel agreed to a procedure known in Ohio courts as a *"prima facie* trial." In its colloquy with counsel and the defendant, the trial court described the process to the defendant:

> " '[T]he *prima facie* case is where the defendant, not technically or legally, in effect admits his guilt and wants the State to prove it.
> \*\*\*
> \*\*\* And the court knowing that and the Prosecutor knowing that, instead of having a half a dozen witnesses on one point they only have one because they understand there will be no contest.' " *Brookhart*, 384 U.S. at 6, 16 L. Ed. 2d at 318, 86 S. Ct. at 1248.[8]

The trial court's remarks prompted an immediate denial by the defendant that he wished to plead guilty to the charge. The trial court pressed the defendant to decide whether he wanted a trial, and defense counsel interjected that a *prima facie* trial was what the defense desired. The *prima facie* trial proceeded. As part of its proof, the State introduced a confession made by one of the defendant's codefendants that implicated the defendant. The defendant was convicted. The Supreme Court reversed the conviction, holding that "the [defendant] himself did not intelligently and knowingly agree to be tried in a

---

[8]In his separate opinion, Justice Harlan noted that, according to the State, Ohio courts developed the *prima facie* trial as a surrogate for a plea of no contest or *nolo contendere*, which was not recognized in the Ohio statutes. The State explained that the mechanism allowed "one \*\*\* charged with a crime which he knows he cannot successfully defend \*\*\* to enter a plea of not guilty and by arrangement require the prosecution to prove only a *prima facie* case.' [Citation.]" *Brookhart*, 384 U.S. at 9 n.\*, 16 L. Ed. 2d at 320 n.\*, 86 S. Ct. at 1249 n.\* (Harlan, J., concurring); see *Gerdes v. Edgar*, 148 Ill. App. 3d 646, 648 (1986) ("In general, a plea of *nolo contendere* acts as a guilty plea within the case to which the plea is entered. However, the defendant may still deny the facts underlying his *nolo* plea in a subsequent or collateral civil proceeding"); Black's Law Dictionary 1069 (7th ed. 1999) (a no-contest plea is "[a] criminal defendant's plea that, while not admitting guilt, the defendant will not dispute the charge").

proceeding which was the equivalent of a guilty plea and in which he would not have the right to be confronted with and cross-examine the witnesses against him." *Brookhart*, 384 U.S. at 7, 16 L. Ed. 2d at 318, 88 S. Ct. at 1248. The Court explained:

> "[The defendant's] emphatic statement to the judge that 'in no way am I pleading guilty' negatives any purpose on his part to agree to have his case tried on the basis of the State's proving a prima facie case which both the trial court and the State Supreme Court held was the practical equivalent of a plea of guilty. Our question *** narrows down to whether counsel has power to enter a plea which is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him. We hold that the constitutional rights of a defendant cannot be waived by his counsel under such circumstances. *** Nothing *** can possibly support a contention that counsel for defendant can override his client's desire expressed in open court to plead not guilty and enter in the name of his client another plea—whatever the label—which would shut off the defendant's constitutional right to confront and cross-examine the witnesses against him which he would have an opportunity to do under a plea of not guilty. Since we hold that petitioner neither personally waived his right nor acquiesced in his lawyer's attempted waiver[, the defendant's conviction is reversed]." *Brookhart*, 384 U.S. at 7-8, 16 L. Ed. 2d at 319, 86 S. Ct. at 1248-49.

The supreme court in *Campbell* characterized *Brookhart* as holding that "the stipulation *** was not merely a matter of trial tactics or strategy, but instead was 'the practical equivalent of a guilty plea.' " *Campbell*, 208 Ill. 2d at 218, quoting *Brookhart*, 384 U.S. at 7, 16 L. Ed. 2d at 319, 86 S. Ct. at 1248. *Brookhart*, interestingly, did not cast its holding in terms of whether the actions of counsel were sound trial tactics or strategy. *Campbell*'s remark was rather a gloss added to render *Brookhart*'s holding in the language of the majority rule that *Campbell* derived from the lower courts, *i.e.*, that "defense counsel may waive a defendant's right to confrontation *if the decision to stipulate is a matter of trial tactics and strategy* and the defendant does not object to the decision" (emphasis added) (*Campbell*, 208 Ill. 2d at 215). It is not an inappropriate gloss, for a guilty plea (or the practical equivalent) is by definition not a matter of *trial* tactics or strategy.

Immediately after describing *Brookhart*'s holding, *Campbell* remarked:

"Thus, as the appellate court correctly recognized in this case, when the State's entire case is to be presented by stipulation[9] and the defendant does not present or preserve a defense (see *People v. Horton*, 143 Ill. 2d 11, 22 (1991) ('a stipulated bench trial is not tantamount to a guilty plea if the defendant presented and preserved a defense')), *or* where the stipulation includes a statement that the evidence is sufficient to convict the defendant, the stipulation implicates fundamental due process concerns and can only be waived by the defendant personally." (Emphasis added.) *Campbell*, 208 Ill. 2d at 218.

Notably, this disjunctive collects and encapsulates the criteria, articulated in *Horton* and other cases, for determining when a stipulated bench trial constitutes a *de facto* plea of guilty such that the defendant must be admonished pursuant to Rule 402. See *Horton*, 143 Ill. 2d at 21-22 (determining whether either of the defendant's two stipulated bench trials was tantamount to a guilty plea such that Rule 402 admonitions were necessary); *Campbell*, 332 Ill. App. 3d at 814 (listing circumstances under which a "stipulation is tantamount to a guilty plea" and the defendant must be admonished under Rule 402). Rule 402 is designed to satisfy the due process requirement that the record "affirmatively show that the [guilty plea] was entered intelligently and with full knowledge of its consequences." *People v. Whitfield*, 217 Ill. 2d 177, 184 (2005), citing *Boykin v. Alabama*, 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969).

The breadth of *Campbell*'s holding soon becomes apparent. As we noted, the *Campbell* disjunctive collects circumstances the supreme court considered determinative of when a proceeding has become, in the language of *Brookhart*, the "practical equivalent of a plea of

---

[9]We are unsure where this particular prong originated. The appellate court included it without citing any authority (*Campbell*, 332 Ill. App. 3d at 814), and the supreme court likewise approved it. The quoted disjunctive collects circumstances indicative of a "fail[ure] to subject the State's case to meaningful adversarial testing" (*People v. Horton*, 143 Ill. 2d 11, 26 (1991)) and a "desig[n] to establish guilt beyond a reasonable doubt" (*People v. Smith*, 59 Ill. 2d 236, 242 (1974)). It is not apparent to us how the degree to which the State relies on a stipulation affects the likelihood of a guilty finding. If the State includes voluminous amounts of evidence in a stipulation but presents testimony on a relatively extraneous matter, it seems the defendant is placed at no greater risk of conviction than if the State relies on the stipulation exclusively. Also, a stipulation on which the State relies exclusively might also have favorable content contributed by the defense. Thus, in judging whether a stipulation "implicates fundamental due process concerns" (*Campbell*, 208 Ill. 2d at 218), what really matters is the content of the stipulation, not which party contributed the content.

guilty." The *Campbell* disjunctive also happens to be a collection of criteria from past Illinois cases for determining when a stipulated bench trial constitutes a *de facto* guilty plea. Not all proceedings employing stipulations are stipulated bench trials, however. "In a stipulated bench trial, a defendant enters a plea of not guilty, and a 'trial' is held based on a set of facts agreed to by the parties." *People v. Gonzalez*, 313 Ill. App. 3d 607, 617 (2000). In *Campbell*, the evidence was presented only partly by stipulation, but the court nonetheless subjected the stipulation to constitutional scrutiny. After laying out the disjunctive, and impliedly finding that the stipulation did not founder on any of its prongs, the court proceeded to examine (in an analysis reminiscent of an inquiry under *Strickland*'s first prong) whether the stipulation was "a matter of sound trial tactics and strategy" in the broader context of the case. *Campbell*, 208 Ill. 2d at 220. This further analysis seemed natural given the court's broader holding, which was that *any* stipulation that is not sound trial tactics or strategy (whether or not part of a stipulated bench trial *per se*) must be approved by the defendant personally.

That *Campbell* calls for such a dual test for determining the tactical or strategical worth of a stipulation is confirmed by *Phillips III*, where the court consolidated *Campbell*'s holding and in so doing distinguished the formal *Campbell* checklist from the more flexible tactics/strategy inquiry:

> "In sum, it is not necessary for either the court or counsel to admonish a defendant about the implications and consequences of a stipulation, and defendant's explicit agreement to the stipulation on the record is not required where, as here, (1) defense counsel's decision to stipulate appears to have been a matter of trial tactics and strategy and defendant does not object to counsel's decision, and (2) the State's entire case is not presented by stipulation, the defendant *does* present or preserve a defense, and the stipulation does not include a statement that the evidence is sufficient to convict." (Emphasis in original.) *Phillips III*, 217 Ill. 2d at 288.

As in *Campbell*, the court in *Phillips III* did not end its analysis once it (impliedly) found that the stipulation did not fail the formal requirements of the *Campbell* disjunctive. Rather, the court went on to decide whether the stipulation was sound trial tactics or strategy in the context of the case. See *Phillips III*, 217 Ill. 2d at 270.

Thus, it is apparent that the supreme court in *Campbell* and *Phillips III* sets out a two-part test for determining when a stipulation is consistent with sound trial tactics or strategy. To be sound, a stipulation must (1) be a matter of valid trial tactics or strategy in the broader context of the case; and (2) meet the formal conditions of the *Campbell* disjunctive. As we saw, the test applies not only to a stipulated

bench trial but to any trial in which a stipulation is employed. Where a stipulation is not a matter of sound trial tactics or strategy under the two-part test, the defendant "must be personally admonished about the stipulation and must personally agree to the stipulation." *Campbell*, 208 Ill. 2d at 221.

As we saw, the supreme court itself sees prong two of the *Campbell/Phillips III* test, *i.e.*, the *Campbell* disjunctive, as a measure of whether a proceeding is "the practical equivalent of a plea of guilty." See *Campbell*, 208 Ill. 2d at 218. Where there is a *de facto* guilty plea, Rule 402 admonitions are required. See *Horton*, 143 Ill. 2d at 21-22. The aim of the first prong of the *Campbell/Phillips III* test is not quite as easy to discern. It seems eminently possible that a stipulation could fail as a matter of sound trial tactics or strategy yet not transform the proceeding into the practical equivalent of a guilty plea. Under this supposition, *Campbell* and *Phillips III* would allow for two different sets of personal admonishments: (1) full Rule 402 admonishments in cases where a *de facto* guilty plea is tendered; and (2) lesser admonishments for cases where the stipulation fails as a matter of legitimate trial tactics or strategy yet does not constitute a *de facto* guilty plea. The supreme court does not, however, appear to recognize the possibility of lesser admonishments. We see this in *Phillips III*'s comment that a stipulation requires no admonishments unless it amounts to a *de facto* guilty plea:

"As this court suggested in *Campbell*, it is only when counsel's stipulations render defendant's trial the ' " 'practical equivalent of a plea of guilty' " ' that a defendant must be ' "personally admonished about the stipulation and must personally agree to the stipulation." ' " *Phillips III*, 217 Ill. 2d at 286, quoting *Campbell*, 208 Ill. 2d at 218, 221, quoting *Brookhart*, 384 U.S. at 7, 16 L. Ed. 2d at 314, 86 S. Ct. at 1248.

After (impliedly) finding that the stipulation did not fail the *Campbell* disjunctive, the court examined whether the stipulation was "a matter of trial strategy." *Phillips III*, 217 Ill. 2d at 286. Upon concluding that the stipulation was valid strategy because it avoided an "unnecessary distraction for the jury," the court reemphasized its reading of *Campbell*:

" '[D]efense counsel may waive a defendant's right of confrontation as long as the defendant does not object and the decision to stipulate is a matter of trial tactics and strategy.' *Campbell*, 208 Ill. 2d at 217. The criteria of *Campbell* are met in this case. Since counsel's stipulations did not render defendant's trial the ' "practical equivalent of a plea of guilty," ' there was no need for defendant to be 'personally admonished about the stipulation' and 'personally

agree to the stipulation.' See *Campbell*, 208 Ill. 2d at 218, 221, quoting *Brookhart*, 384 U.S. at 7, 16 L. Ed. 2d at 319, 86 S. Ct. at 1248." *Phillips III*, 217 Ill. 2d at 287.

As we read *Campbell* and *Phillips III*, unless the stipulation transforms the proceeding into the functional equivalent of a guilty plea, no admonitions at all are required.

The following two propositions apparently are equivalent for the court in *Campbell* and *Phillips III*: (1) personal admonitions are required only where the stipulation is not a matter of sound trial tactics or strategy; and (2) personal admonitions are required only where the stipulation transforms the proceeding into the functional equivalent of a guilty plea. Therefore, we take the entire *Campbell/Phillips III* test as a measure of whether a stipulation is a *de facto* guilty plea. Thus, a stipulation may transform the proceeding into a *de facto* guilty plea even if "the State's entire case is not presented by stipulation, the defendant *does* present or preserve a defense, and the stipulation does not include a statement that the evidence is sufficient to convict." (Emphasis in original.) *Phillips III*, 217 Ill. 2d at 288.[10] The first prong of the *Campbell/Phillips III* test entails an open-ended,

---

[10]Revisiting the issue of stipulations in *People v. Rowell*, 229 Ill. 2d 82, 102 (2008), the supreme court wrote of *Campbell* and *Phillips III*:

"In *Campbell*, this court held that 'defense counsel may waive a defendant's right of confrontation as long as the defendant does not object and the decision to stipulate is a matter of trial tactics and strategy. [Citation.] However, 'when the State's entire case is to be presented by stipulation and the defendant does not present or preserve a defense [citation], or where the stipulation includes a statement that the evidence is sufficient to convict the defendant,' the defendant must personally waive his right of confrontation. [Citation.] As we explained in [*Phillips III*], *Campbell* 'imposed no obligations on the trial court or counsel to admonish the defendant and ensure that the advisement is made a part of the record,' *except in the preceding instances*, when the stipulation is tantamount to a guilty plea." (Emphasis added.)

The suggestion here is that admonishments are necessary only where a stipulation fails under the *Campbell* disjunctive. We are unable to reconcile this stance with the court's analyses in *Campbell* and *Phillips III*, where, apart from the *Campbell* disjunctive, the court decided whether the stipulations were sound trial tactics or strategy. The discussions in *Campbell* and *Phillips III* about the strategy/tactics of the stipulations in those cases cannot be explained as applications of *Campbell*'s requirement that the defendant must present and preserve a defense where the State's entire case is presented by stipulation. In neither case did the State present all of its evidence by stipulation, so that particular prong of the *Campbell* disjunctive did not apply. See *Phillips III*, 217 Ill. 2d at 272-78, 286; *Campbell*, 208 Ill. 2d at 219-21.

fact-bound inquiry into whether a stipulation transformed the proceeding into the functional equivalent of a plea of guilty. This brings Illinois into line with a number of other jurisdictions employing such a contextually-sensitive approach to determining whether a stipulation amounts to a *de facto* guilty plea. See generally J. Zitter, Annot., *Guilty Plea Safeguards as Applicable to Stipulation Allegedly Amounting to Guilty Plea in State Criminal Trial*, 17 A.L.R.4th 61 (1982) (collecting cases).

Read in this way, *Campbell* and *Phillips III* have watershed consequences for stipulated bench trials. Take a hypothetical defendant against whom the State has overwhelmingly compelling evidence. The defendant unsuccessfully brings a motion to suppress that evidence. Recognizing that his only colorable chance against the State is to appeal the denial of the motion to suppress, the defendant agrees to a stipulated bench trial. The defendant knows that "[a] guilty plea waives all non-jurisdictional defenses" and so he must avoid tendering a stipulation that is "tantamount to a guilty plea" or else lose the right to appeal the suppression ruling. *Horton*, 143 Ill. 2d at 22. The parties agree to a stipulation in which the only defense to the charges is the preservation of the pretrial motion—and indeed so strong is the State's case that no other defense could be ethically pressed. Before *Campbell* and *Phillips III*, it was simply a matter of form for a defendant to "avoid the waiver rule" while still enjoying "the benefits and conveniences of a guilty plea procedure." *Horton*, 143 Ill. 2d at 22. A defendant had only to meet the criteria collected in the *Campbell* disjunctive. That is, he had only to ensure that (1) he did not stipulate that the evidence was sufficient to convict him; and (2) he presented and preserved a defense, if the State presented its entire case by stipulation.

Even then, when avoiding the waiver rule was a relatively straightforward and formal exercise, this court criticized stipulated bench trials as a pitfall for the defense:

> "Although there is a remote theoretical possibility that the defendant may be acquitted [in a stipulated bench trial], the reality is that factual guilt is a foregone conclusion. After all, neither a reasonable defendant nor a prosecutor will choose to pursue a stipulated bench trial (or guilty plea) if the evidence is doubtful. Thus, once a stipulated bench trial is conducted the defendant will

Notably, the defendant in *Rowell* argued under the *Campbell* disjunctive alone and not under the more flexible "strategy/tactics" prong of the *Campbell/Phillips III* test. Perhaps this is why the *Rowell* court did not mention the latter component of the test.

*a fortiori* be found guilty by the trial court. But unlike the case of a guilty plea, the right to appeal any pretrial objections is preserved. In other words, if the defendant's pretrial motion to suppress was denied and defense counsel believed the denial was erroneous, it would be improper and most probably patent incompetence for defense counsel to allow defendant to plead guilty, since review of the denial of the motion would be barred.

Stipulated bench trials are tricky creatures prone to mistakes by trial courts and attorneys alike. Precise language must be used. To properly preserve the denial of a pretrial motion for review, the stipulation must be only to the existence of the evidence. [Citation.] If counsel stipulates that the evidence is sufficient to convict, then the stipulated bench trial mutates into a guilty plea and the suppression issues are waived on appeal. [Citation.]

Because of the intricacies involved, the use of stipulated bench trials has been roundly criticized for some time. [Citations.] Yet, for some reason, neither our supreme court nor the legislature has acted to remedy this enigma.

A stipulated bench trial is, in reality, nothing more than a glorified guilty plea that wastes precious judicial resources and is likely to be misunderstood, particularly by the defendant. There also is a risk that the wrong language will be used, thus making the stipulated bench trial tantamount to a guilty plea and foreclosing the very issue sought to be preserved by resorting to the stipulated bench trial." *Gonzalez*, 313 Ill. App. 3d at 617-18.

We suggested "a much better approach to preserving suppression issues in the face of strong evidence against a defendant." *Gonzalez*, 313 Ill. App. 3d at 618. We urged the legislature to enact the procedure known as the "conditional plea," then in use in the federal system and some state systems. Under those systems, "certain pretrial motions, such as suppression motions, are subject to review from an ensuing conviction notwithstanding the fact that the conviction arises from a guilty plea rather than a trial." *Gonzalez*, 313 Ill. App. 3d at 618. We noted that allowing conditional pleas would, among other things, "reduce claims of ineffective assistance of counsel that frequently arise in appeals from stipulated bench trials." *Gonzalez*, 313 Ill. App. 3d at 619.

Once "tricky," stipulated bench trials have been made veritably treacherous by *Campbell* and *Phillips III*, if indeed these cases hold what we read them to hold. Under prior law, a defendant could navigate around the waiver rule by avoiding the talismanic language, *i.e.*, by not conceding the sufficiency of the evidence to convict, and, if the State presented all its evidence through stipulation, by also presenting and preserving a defense. Such a defense could consist of a

suppression issue alone. See *Horton*, 143 Ill. 2d at 22. Thus, if the stipulation met the formal requirements collected in the *Campbell* disjunctive, it would *a fortiori* not constitute a *de facto* guilty plea. After *Campbell* and *Phillips III*, however, not only must the stipulation pass the *Campbell* disjunctive, it must also be a matter of sound tactics or strategy in the broader context of the trial. The strategy/ tactics test is a fact-bound inquiry whose outcome in any given case is difficult to prognosticate, thus making it even more likely that a defendant will fall unwittingly into a *de facto* guilty plea and waive his right to appeal a pretrial decision.

*Campbell* and *Phillips III*, as we read them, have particularly acute effects for our hypothetical defendant, who faces such strong State's evidence that his only reasonable avenue is to preserve a pretrial motion to suppress. Under prior law in *Horton*, the preservation of a suppression issue would not prevent a court from deeming a stipulated bench trial a *de facto* guilty plea if the defendant stipulated to the sufficiency of the evidence. See *Horton*, 143 Ill. 2d at 22. Presumably this is because a suppression issue is not a *trial* defense as such; it seeks to exclude evidence rather than confront its force. Likewise, under *Campbell* and *Phillips III*, the preservation of a suppression issue alone will not preclude a court from finding a stipulation to be unsound trial tactics or strategy. Indeed, even the presentation of a proper trial defense will not avoid constitutional strictures if the stipulation is otherwise unsound in the context of the trial. We believe the need for a conditional-plea option is now more urgent than ever if a defendant facing compelling State's evidence is to avoid waiving his right to appeal a suppression ruling.

Though we do not decide the issue, we have serious reservations about the tactical or strategical worth of the March 2005 stipulation. The stipulation obviously did not have any of the formal marks of a guilty plea set forth in the *Campbell* disjunctive. The stipulation expressly stated that defendant was not conceding the sufficiency of the evidence to convict. Moreover, although the State's entire case was presented by stipulation, defendant presented and preserved a defense, *i.e.*, the suppression issue.

What we doubt is that the stipulation met *Campbell*'s and *Phillip III*'s further requirement that it be "a matter of sound trial tactics and strategy" in the wider context of the trial. See *Campbell*, 208 Ill. 2d at 220. To show this, we first present examples of the fact-intensive inquiry into tactics/strategy required by *Campbell*. We begin, naturally, with *Campbell* and *Phillips III*. The defendant in *Campbell* was charged with residential burglary. At trial, there was live testimony from one of the victims, Powell, as well as stipulated testimony from

the other victim, Hoerr. Powell testified that he was on the second floor of the house he was renting with Hoerr when he heard knocking at the front door. Powell knew that Hoerr was downstairs in the living room. The knocking persisted for about two minutes and then Powell heard voices. He went downstairs and saw the defendant walking out the front door. Powell did not know the defendant and had never seen him in the house. Powell and Hoerr decided to call the police. According to the stipulation, Hoerr would testify that the defendant walked into the house without Hoerr's permission and then asked if there was a room for rent. When Hoerr said no, the defendant left the house. *Campbell*, 208 Ill. 2d at 206-08. The court found a sound purpose for the stipulation:

> "Defense counsel used the stipulation to establish defendant's lack of any criminal intent, because the stipulated testimony established that: defendant knocked on the door, then came into the hallway; defendant saw Hoerr and asked if there was a room for rent; when Hoerr said there was no room for rent, defendant left the premises. \*\*\* Absent the stipulation, defendant had no explanation for his presence at the residence and certainly risked the jury concluding \*\*\* that defendant's entry was unauthorized. Although the stipulation contained Hoerr's statement that defendant did not have permission to enter the residence, the stipulation also allowed defense counsel to present evidence that there was a reasonable and legitimate explanation for defendant's entry into the premises." *Campbell*, 208 Ill. 2d at 220.

The defendant in *Phillips III* was arrested for driving with a suspended license. During a search of her car, the police found drugs underneath the driver's seat. The officer who searched the car testified that the defendant admitted that the drugs were hers. In open court and in the presence of the defendant, defense counsel stipulated to lab reports finding that the substances recovered from the defendant's car contained cannabis and cocaine. The defendant then testified, and she claimed that she did not know the drugs were in the car and that the police "badgered" her into confessing. *Phillips III*, 217 Ill. 2d at 274-76.

The supreme court held that the stipulation served a valid purpose:

> "Defense counsel in this case appears to have chosen, as a matter of trial strategy, to focus the jury's attention upon the critical issue of whether defendant knowingly possessed the cocaine found in her car. Without contradiction, Officer Hampton testified that he searched defendant's car and recovered 25 plastic bags, each containing a white substance that appeared to be cocaine. When confronted with that evidence, even the defendant acknowledged,

'It looks like drugs.' Under the circumstances, we fail to see any tactical advantage defendant might have obtained from extended forensic testimony about the analysis and nature of the 'off-white chunks' found individually packaged in 25 plastic bags. To the contrary, we believe such testimony would have been an unnecessary distraction for the jury." *Phillips III*, 217 Ill. 2d at 286.

We have found no published case since *Phillips III* where an Illinois court had occasion to review the tactical or strategical worth of a stipulation that concerned more than lab tests or chains of custody. Foreign authorities feature a wider variety of stipulations. We have reviewed for guidance those courts that employ, like *Campbell*, a flexible tactics/strategy approach to stipulations. One factor emphasized in many decisions is the benefits of the stipulation, such as whether it avoided the presentation of inflammatory testimony (see, *e.g.*, *Hawkins*, 185 F.3d at 1155 ("The live testimony of a frail, elderly rape victim could have been extraordinarily damaging to the defense")) or was agreed to in exchange for the State's dropping counts (see, *e.g.*, *Stephens*, 609 F.2d at 233). Not all courts seem to require that a stipulation have such worth. See, *e.g.*, *Cruzado v. People of Puerto Rico*, 210 F.2d 789, 791 (1st Cir. 1954) (where it was stipulated that the defendant would be tried based on the trial transcripts of codefendants, the court upheld the stipulation, noting only that the stipulation preserved the right of confrontation because the defendant cross-examined witnesses in the prior trials). The consensus, however, among courts that apply an approach like *Campbell*'s is that the stipulation must not put the defendant at a demonstrable disadvantage such that a finding of guilty is virtually assured.

To illustrate, we compare several cases. In *Palfy v. Cardwell*, 448 F.2d 328 (6th Cir. 1971), the defendant was charged with aiding and abetting the stabbing death of one of three victims in a single night's crime spree. The defendant was tried entirely on stipulated facts. The stipulation stated that the defendant and his companions beat and robbed the first two victims. It was further stipulated that the defendant tried to restrain one of his companions during the second beating because he thought the victim might otherwise be killed. The stipulation also provided that two of the defendant's companions fatally stabbed the third victim. In connection with this incident, it was stipulated that the defendant did not know that his companions carried a knife that night. *Palfy*, 448 F.2d at 329-30. The appellate court held that counsel's decision to stipulate was reasonable:

"Trial counsel *** were in a difficult position. Two of the five participants had been tried and both were found guilty of first

degree murder. One was sentenced to death and the other was sentenced to life imprisonment. Witnesses to the [stabbing death] of Paul Morlan had previously testified to the gory incident which left blood running down the street for over 150 feet. The defense attorneys had no doubt that the state would again present a convincing and inflammatory case. They also wished to keep [the defendant's] previous criminal record out of evidence. The attorneys therefore decided to use the stipulations.

The substance of trial counsel's defense was that [the defendant] lacked an intent to kill. Such an intent is a necessary element of first degree murder in Ohio even when the killing occurs in the perpetration of a robbery. *** Stipulated facts indicated that [the defendant] had attempted to stop the beating of Ivan Ward to prevent a killing and that [the defendant] did not know that any of his companions carried a knife. Defense counsel argued that these stipulations showed that [the defendant] intended only to rob some people and had no intent to kill.
***

The defense strategy of [the defendant's] counsel appears eminently reasonable. While the strategy called for stipulating facts which were damaging to [the defendant], there was no foregone conclusion that the court would decide that a probable consequence of his acts was a killing. Counsel also stipulated facts which perhaps would have shown that Morlan's death was not the natural result of what [the defendant] intended to do." *Palfy*, 448 F.2d at 331-32.

By contrast, it was held in *Commonwealth v. Davis*, 457 Pa. 194, 197, 322 A.2d 103, 105 (1974), that the stipulation made a conviction inevitable. In *Davis*, the defendant was charged with the robbery of a milk truck. The evidence at trial was presented entirely by stipulation. Defense counsel stipulated that, if the truck driver were present, he would testify that two men robbed him at gunpoint. It was further stipulated that, at the preliminary hearing, the driver identified the defendant as one of the men. The defendant was convicted, and he appealed. The supreme court of Pennsylvania agreed with the defendant that the stipulation "was so damaging [that] *** [it] should have been surrounded by safeguards similar to those attending the entry of a guilty plea." *Davis*, 457 Pa. at 197, 322 A.2d at 105. The court held that the stipulation "made the outcome a foregone conclusion." *Davis*, 457 Pa. at 197, 322 A.2d at 105.

A similarly dim view was taken of the stipulation in *Glenn v. United States*, 391 A.2d 772 (D.C. App. 1978). In *Glenn*, the defendant was charged with carrying a pistol without a license. His counsel

stipulated to a trial based on the testimony at the suppression hearing. A police officer testified at that hearing that he had stopped the defendant for a speeding violation and witnessed a handgun underneath the defendant's seat. *Glenn*, 391 A.2d at 773. The hearing testimony also "included [the defendant's] admission that he was in possession of [the] gun."[11] *Glenn*, 391 A.2d at 775 n.4. The appellate court agreed with the defendant that he should have been given guilty-plea admonishments. The court reasoned that the stipulation "made the trial court's task academic" and that "[t]here was nothing left to do on this record but to convict [the defendant]." *Glenn*, 391 A.2d at 775 n.4.

Applying these authorities, we fail to see how the March 2005 stipulation left any colorable basis for arguing innocence. Wechter testified in posttrial proceedings that he was selective in crafting the stipulation. He deliberately did not incorporate the entirety of defendant's statements to the police but excluded "a number of details that [he] thought would be harmful to [the] defense." At the same time, he "included some facts that [he] thought left the door open to argument." We find it odd, then, that Wechter made no argument when either the September 2004 or the March 2005 stipulation was presented. Presumably, if Wechter believed he had any argument, it pertained to the element of knowledge, for as far as we know it has never been questioned that the lurid photographs attached to the stipulations constitute child pornography.

Looking, then, at the element of knowledge, we believe it was, in the words of *Palfy* and *Davis*, a "foregone conclusion" that the court would find that element satisfied. The March 2005 stipulation incorporates a portion of defendant's statement to Lamela. In that statement, defendant described to Lamela his process for acquiring and storing pornography. Defendant stated that he uses a search engine to find pornography "and then downloads all the files to his hard drive." "Later, he transfers the files to a disk and then views them." Defendant "does not know what he downloads until the file has been viewed." Defendant "last downloaded pornography from the website on the preceding weekend" and "did not have time to transfer those files to a disk and did know what files were downloaded."

If we credit defendant's sequence of (1) download to hard drive, (2) transfer to disc, and (3) review, the gist of the statement to Lamela is that defendant, as a matter of custom, does not know what kind of pornography is stored on his hard drive until he transfers it to a disc.

---

[11]Presumably, the defendant made this admission to the police officer.

Thus, defendant might have had a reasonable argument on knowledge had the issue been whether he was aware of child pornography stored only on his hard drive. The stipulation, however, was concerned with child pornography stored on disc, and defendant admitted to Lamela that he had six discs in his apartment containing pornography. When Lamela asked defendant if he knew how many video clips of child pornography were contained on the discs, defendant replied, " 'Not very many.' " This baldly incriminating admission is ameliorated nowhere in the stipulation.

If anything, the stipulation highlights the incriminating nature of the admission. The stipulation takes pains to stress that defendant was ignorant of the kind of pornography residing on his *hard drive*. The demonstrative evidence attached to the stipulation, however, included a video clip that had been transferred by defendant from his hard drive to a disc. The stipulation contains no disclaimer of defendant's knowledge with respect to the kind of pornography stored on his discs but in fact fairly invites an inference that defendant becomes aware of the nature of the pornography as he transfers it to disc. For defendant to admit that he possessed " '[n]ot very many' " video clips of child pornography on his discs was consistent with the process he outlined for how he became aware of what kind of pornography he possessed. In our view, the stipulation's emphasis on what defendant knew at what time in the process of acquiring files from the Internet actually sealed defendant's guilt in these particular circumstances. Whatever Wechter's intentions, the end product was a stipulation that might have given the trial court pause had the child pornography at issue been stored on defendant's hard drive alone. Because, however, the subject files were on disc, the stipulation basically made the State's case for it.

Notably, Wechter himself apparently believed that either stipulation would have made a conviction a *fait accompli*. On September 24, 2004, Wechter wrote the following to defendant:

> "If we proceed with the stipulated bench trial, then you should assume that the judge will find you guilty and sentence you for this felony offense.
>
> * * *
>
> *** After the judge makes a guilty finding, the case will be continued for a sentencing hearing. ***
>
> As I noted, the purpose of the stipulated proceeding is to preserve our search and seizure claim for appeal."

On March 17, 2005, Wechter wrote: "In both of our conversations, you repeatedly told me that you wanted to enter an amended stipulation

to the evidence that would doubtless result in a guilty finding by the judge." Healthy realism can co-exist with fighting spirit, but Wechter offered no argument whatsoever on either stipulation. See *People v. Dodson*, 331 Ill. App. 3d 187, 193 (2002) (defense counsel offered no argument on the sufficiency of the evidence in presenting the State-drafted stipulation, whose content "virtually ensured a conviction"; the "stipulated bench trial provided a process to judgment that lost its character as a confrontation between adversaries"); *People v. Levey*, 8 Cal. 3d 648, 651, 504 P.2d 452, 455, 105 Cal. Rptr. 516, 519 (1973) (defense counsel did not argue sufficiency of the evidence when the stipulation was presented and it was "clear throughout the proceedings in the trial court that it was assumed by both the People and defendant the stipulation would result in a finding of guilt"). In our estimation, this was a plain "fail[ure] to subject the State's case to meaningful adversarial testing." *Horton*, 143 Ill. 2d at 26. One might even say that "the circumstances indicate that calculated efforts have been made which amount to the entry of a guilty plea." *Smith*, 59 Ill. 2d at 242.

The State, now obliged to defend the reasonableness of the stipulation from the defense's perspective, argues that the stipulation was a prudent course because it "included only a part of the incriminating evidence the People could otherwise have presented at trial." The State points to the audiotaped interview in which Lamela asked defendant how many of his discs contained child pornography, to which defendant replied, in the police transcript, "several times they threw it in there," or in the certified transcript, "sometimes they throw it in there." These damaging remarks were left out of the stipulation, the State notes. That does not make a functional difference, we think. We recognize that the strength of the State's case often places defense counsel in a difficult and even untenable situation, and we understand the worth of excluding incriminating evidence wherever feasible. Where, however, a stipulation contains such an obviously incriminating statement from defendant, rendering a finding of guilt basically compulsory, we do not consider it a saving virtue that any number of like statements were excluded from the stipulation.

We close with a general observation on Rule 402. What we enforce today is the principle, roughly traceable to *Horton*, that where a stipulated bench trial (or any trial in which a stipulation figures) amounts to a *de facto* guilty plea, the defendant must be given Rule 402 admonitions. See *Horton*, 143 Ill. 2d at 22. In 1997, Rule 402 was amended expressly to incorporate *Horton*'s holding and thereby "to require that admonitions be given in cases in which the defense offers

to stipulate to the sufficiency of the evidence to convict" (177 Ill. 2d R. 402, Committee Comments, at lxxvii). Accordingly, the operative language on the scope of the admonition requirement was amended to state that "[t]he court shall not accept a plea of guilty *or a stipulation that the evidence is sufficient to convict* without first, by addressing the defendant personally in open court, informing him of and determining that he understands" his various constitutional rights. (Emphasis added.) 177 Ill. 2d R. 402(a). The admonitions themselves were broadened to add an advisement that, "by stipulating the evidence is sufficient to convict, [the defendant] waives the right to a trial by jury and the right to be confronted with any witnesses against him who have not testified." 177 Ill. 2d R. 402(a)(4). The admonitions were otherwise unchanged. Thus, the rule now requires that, for *de jure* and *de facto* guilty pleas alike, the defendant must be advised, *inter alia*: "that [he] has the right *to plead not guilty*, or to persist in that plea if it has already been made, or to plead guilty." (Emphasis added.) 177 Ill. 2d R. 402(a)(3). Where a defendant manifests his intent to plead guilty by formally tendering such a plea, this admonition apprises the defendant that he has the right not to continue in that course. The admonition thus serves to confirm whether the defendant will persist in the intent he had manifested unequivocally in deciding to tender a guilty plea.

The admonition has no such salutary effect, however, where the defendant has manifested no intent to plead guilty but rather the opposite intent, *i.e.*, to go to trial—albeit a stipulated bench trial. The purpose of requiring formal judicial admonitions addressed directly to a defendant is to make as certain as possible that the defendant understands what he is doing. To tell a defendant that he has the option to plead not guilty, when to his knowledge that is precisely what he has done and is continuing to do by going to trial, will seem confusingly gratuitous to him. In this circumstance, one of two scenarios will ensue. First, if the defendant has the presence of mind, he will ask enough of the right questions to learn that what the trial court implied in saying that he has the right to plead not guilty is that the proposed stipulation is, appearances aside, a guilty plea and hence he will receive no "trial" in any meaningful sense. The defendant will then reconsider the wisdom of the stipulation, either abandoning it or persisting in it. If he persists, his new awareness of the ramifications of the stipulation will have in essence changed his *de facto* guilty plea into a *de jure* guilty plea. In either case there will be no *de facto* guilty plea. Second, and alternatively, if the defendant is not keen enough to learn the true

nature of his stipulation, he will confusedly tender the equivalent of a guilty plea while falsely believing his trial will be something above a sham. The risk of an unknowing relinquishment of rights is even greater after *Campbell* and *Phillips III*, because now a *de facto* guilty plea can arise in more circumstances than are delimited in the *Campbell* disjunctive.

Given that the tendering of a stipulation equivalent to a guilty plea must always fall into one of these two broad scenarios, there is no realistic chance of a *bona fide de facto* guilty plea ever properly going through. Thus, the extension of Rule 402 to *de facto* guilty pleas rests on a fiction. We recommend that Rule 402 be amended to eliminate *de facto* guilty pleas altogether. This could be done by requiring special admonishments where the defendant tenders a stipulation that, because it concedes the sufficiency of the evidence to convict or has other hallmarks identified in *Campbell* and *Phillips III*, is tantamount to a guilty plea. In that circumstance, the trial court must advise the defendant in clear and explicit terms that what he has tendered is functionally a guilty plea and will result in a guilty finding as assuredly as any formal guilty plea. The court should then apprise the defendant, per Rule 402, of all rights he will relinquish should he persist in the stipulation. Because, as we noted above, stipulations are often utilized by defendants who do not wish to contest guilt but to pursue an appeal of a pretrial suppression ruling, the trial court should, in addition to the standard Rule 402 admonitions, include an advisement that is at best implied in the rule: that the defendant will waive appeal of all nonjurisdictional issues (including suppression issues) by pleading guilty. See *Horton*, 143 Ill. 2d at 22 ("[a] guilty plea waives all non-jurisdictional defenses or defects"). Requiring such careful and explicit admonishments in the case of a stipulation that is tantamount to a guilty plea will eliminate from Illinois law the fiction of the *de facto* guilty plea.

■ To summarize, we hold that defense counsel did not validly waive defendant's right of confrontation when the March 2005 stipulation was presented, because defendant was not aware of the stipulation's specific content. In addition, as our analysis shows, there is a serious question as to whether the March 2005 stipulation was tantamount to a guilty plea.

Because Wechter's ineffectiveness in handling the March 2005 stipulation is itself a ground for reversal, we do not reach defendant's remaining claims of ineffectiveness. We also do not reach defendant's claim that the stipulation was insufficient to support a conviction.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Kane County and remand this case for proceedings consistent with this opinion.

Reversed and remanded.

HUDSON and JORGENSEN, JJ., concur.